## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAN ANTONIO FIRE AND POLICE
PENSION FUND and FIRE AND POLICE
HEALTH CARE FUND, SAN ANTONIO

              Plaintiffs,

v.

DOLE FOOD COMPANY, INC., DAVID H.
MURDOCK and C. MICHAEL CARTER

              Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs San Antonio Fire and Police Pension Fund ("San Antonio F&P") and Fire & Police Health Care Fund, San Antonio ("San Antonio Health"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Dole Food Company, Inc. ("Dole" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; (iii) analyst reports concerning Dole; (iv) pleadings and judicial opinions, including the testimony and other evidence referenced therein, in *In re Dole Food Co., Inc., Stockholder Litigation*, C.A. No. 8703-VCL (Del. Ch.) and *In re Appraisal of Dole Food Company, Inc.*, C.A. No. 9079-VCL (Del. Ch.); and (v) other public information regarding the Company.

## INTRODUCTION

1.      This securities class action is brought on behalf of sellers of Dole's publicly

traded common stock between January 2, 2013 and October 31, 2013, inclusive (the "Class Period").

2.      The claims asserted herein are alleged against Dole, David H. Murdock (Dole's, Chairman and CEO), and C. Michael Carter (Dole's former President, COO, General Counsel and Corporate Secretary and a member of the Board), (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules promulgated thereunder, including SEC Rule 10b-5 and 17 C.F.R. §240.10b-5.

3.      This action arises out of the Defendants' fraudulent scheme to acquire the publicly held shares of Dole, one of the world's largest producers of fresh fruit and vegetables, and convert the Company to a privately-held enterprise owned by Defendant Murdock.   To implement their scheme, Defendants made a series of materially false and misleading negative statements about the Company's operations and finances that were intended to deceive the investing public and artificially lower the price of Dole's stock so that Defendant Murdock could buy the Company on the cheap.   Defendants' scheme resulted in Murdock purchasing Dole, Murdock's long-standing goal since the Company was forced to go private in 2009, for approximately $1.6 billion on November 1, 2013, the first day after the end of the Class Period.

4.      The Class Period starts on January 2, 2013, when Defendants began releasing false, negative information designed to artificially depress the price of Dole's common stock. Specifically, in furtherance of their scheme, Defendants made materially false and misleading statements concerning: (i) the Company's 2013 earnings guidance; (ii) the cost savings which the Company would achieve through a transaction with ITOCHU Corporation of Japan, one of Dole's partners and distributers; (iii) the true value of Dole's key real estate assets; and (iv) the cancellation of the Company's stock repurchase program in May 2013.

5.      As alleged herein, Defendants made these statements knowingly and/or recklessly and for the purpose of artificially deflating the price of Dole's common stock for the benefit of Defendant Murdock – and to the great detriment of the Class.   Indeed, Defendants' false statements caused the price of Dole stock to fall as low as $9.27 per share before Defendant Murdock made his lowball offer of $12.00 per share to acquire the Company.   Accordingly, investors, including Plaintiffs, have suffered enormous financial losses by selling Dole stock at artificially reduced prices as a result of Defendants' wrongdoing.

6.      Plaintiffs' allegations draw on the extensive record of Defendants' intentional misconduct developed through the trial of an action brought by Dole shareholders, whose Dole stock was ultimately acquired by Defendant Murdock.   On August 27, 2013, Vice Chancellor J. Travis Laster of the Court of Chancery of the State of Delaware issued his opinion in *In re Dole Food Co. Inc. Stockholder Litigation*, Consolidated C.A. No. 8703-VL and *In re Appraisal of Dole Food Company, Inc*. Consolidated C.A. No. 9079-VCL, consolidated cases concerning Defendants' take-private of Dole, holding that Defendants Murdock and Carter had breached their fiduciary duty of loyalty to Dole's shareholders and finding Murdock and Carter to be jointly and severally liable for damages of $148.19 million.   Specifically, Vice Chancellor Laster found that "[B]efore Murdock made his proposal [to purchase Dole], ***Carter made false disclosures about the savings Dole could realize after selling approximately half of its business in 2012***." Notably, Vice Chancellor Laster found Murdock and Carter's conduct to be "***intentional and in bad faith***" and that "***Carter engaged in fraud***."

7.      Vice Chancellor Laster concluded that Murdock's final offer of $13.50 per share was materially deficient and based upon the fraudulent scheme to depress the price of Dole stock, and ordered that all Dole shareholders whose shares were purchased by Murdock were

{FG-W0400540.}

entitled to receive an additional $2.74 per share, putting the "conservative" fair value for acquisition of Dole stock by Murdock at $16.24 per share.

8.     In connection with Murdock and Carter's liability, the Court of Chancery made the additional findings supporting Plaintiffs' allegations that: (i) Defendants' scheme to take Dole private was memorialized in a pre-Class Period memorandum that functioned as a step-by-step playbook for effectuating the take-private transaction; (ii) Defendants' statements concerning "cost savings" were false; (iii) based on Dole's financial advisor's estimates and its own internal reports, Defendants knew that their cost-saving statements were false; (iv) Defendants' statements concerning the reasons for cancelling a stock repurchase program, initially announced for the purported purpose of increasing shareholder value, were pretextual and false; and (v) as Defendant Carter himself admitted, Defendants' statements concerning the cancellation of the stock repurchase program were issued for the purpose of further driving down the price of Dole's common stock.

9.     Accordingly, Plaintiffs and the Class are now entitled to recover from Defendants as a result of their materially false and misleading statements and omissions.  Plaintiffs and the Class have incurred significant harm as a result of Defendants' fraud, for which Defendants should be held accountable.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 and 17 C.P.R. § 2401.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 12 U.S.C. §78aa.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d).  Dole is incorporated in this District, and many of

{FG-W0400540.}

the acts and conduct that constitute the violations of law complained of herein occurred in this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

### A.    Plaintiffs

12.    San Antonio Fire and Police Pension Fund ("San Antonio F&P") is a public pension fund located at 11603 W. Coker Loop, Suite 201, San Antonio, Texas that provides comprehensive retirement, death and disability benefits for the City of San Antonio's police officers, firefighters, retirees and their beneficiaries.  As set forth in the attached certification, San Antonio F&P sold Dole shares during the Class Period and was damaged thereby.

13.    Fire and Police Health Care Fund, San Antonio ("San Antonio Health" and together with San Antonio F&P, "Plaintiffs" ) is a public health care fund located at 11603 W. Coker Loop, Suite 130, San Antonio, Texas that provides medical benefits to retired firefighters and police officers and their beneficiaries.  As set forth in the attached certification, San Antonio Health sold Dole shares during the Class Period and was damaged thereby.

### B.    Defendants

#### 1.    Dole

14.    Dole is a Delaware corporation with its principal executive offices located at One Dole Drive, Westlake Village, California.  During the Class Period, Dole stock traded on the New York Stock Exchange ("NYSE") under the stock symbol "DOLE."   As of September 27, 2013, the record date for the buyout of Dole stockholders at issue in this litigation, Dole had 90,329,748 shares of common stock outstanding.  Dole described itself as "the world's largest producer and marketer of high-quality fresh fruit and fresh vegetables" that "markets a growing

5

{FG-W0400540.}

line of packaged and frozen food, and is a produce industry leader in nutrition education and research."  By the beginning of the Class Period, Dole had built a fully-integrated operating platform in the Americas, Europe, Asia and Africa, and distributed its approximately 180 products in more than 90 countries.

### 2.    The Individual Defendants

15.    Defendant David H. Murdock was Dole's Chairman of the Board and CEO. Murdock joined Dole as Chairman of the Board and CEO in July 1985 and continued as Dole's CEO until June 2007.  Murdock was reappointed as Dole's CEO in February 2013.   Murdock took Dole private in 2003 and was its sole owner until 2009, when the Company's shares were again offered to the public.  During the Class Period, Murdock was the beneficial owner of approximately 40% of Dole's outstanding stock (35,823,585 shares as of September 27, 2013) and a member of the Company's Board of Directors.  Murdock was also Chairman of the Board and CEO of Dole's former parent company, Castle & Cooke, Inc. ("Castle & Cook"), and beneficially owned all of the capital stock of Castle & Cooke.  During the Class Period, Murdock reviewed and approved Dole's press releases and public filings with the SEC that contained materially false and misleading statements, as detailed herein.

16.    Defendant C. Michael Carter ("Carter") was Dole's President, COO, General Counsel and Corporate Secretary and was a member the Company's Board.  Carter originally joined Dole in October 2000 as Vice President, General Counsel and Corporate Secretary.  Carter joined the Board in February 2013.  Carter has also served as attorney-in-fact for Castle & Cooke, the David H. Murdock Living Trust and Murdock himself.  Carter further served as Murdock's personal counsel in connection with Murdock's sale of the Hawaiian island of Lanai for a reported $300 million.  During the Class Period, Carter reviewed, approved and signed and made statements in Dole's press releases and filings with the SEC that contained materially false

and misleading statements and participated in conference calls with securities analysts during which he made materially false and misleading statements, as detailed herein.

17.    Defendants Murdock and Carter are referred to herein as the "Individual Defendants."  In their roles at the Company, the Individual Defendants directly participated in the management of Dole's operations and, because of their positions at Dole, were involved in the drafting, reviewing, publishing and/or disseminating the false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Dole's reports to the SEC, press releases, conference calls to investors, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Because of their positions and access to material, non-public information available to them, each of the Individual Defendants knew that the true facts had not been disclosed to and were being concealed from the public, and that statements alleged herein were materially false and/or misleading when made.

## BACKGROUND AND NATURE OF THE FRAUD

### A.    History And Organization Of Dole

18.    Dole has its origins in Castle & Cooke, a company established in 1851 by two Hawaiian missionaries and that later became the world's largest producer of fruits and vegetables.  In 1932, Castle & Cooke acquired 21% of the Hawaiian Pineapple Company, which was founded in 1901 by James Dole.  Castle & Cooke acquired the balance of the Hawaiian Pineapple Company in the 1960s and was later renamed the Dole Food Company, Inc. in 1991.  Dole's common stock became publicly traded and was first listed on the NYSE in 1964.

### B.    Murdock Buys Dole And Intends To Keep It Private

19.    In 1985, Murdock acquired Castle & Cook, which was hovering near insolvency, through a merger with Flexi-Van Corporation ("Flex-Van"), a transportation leasing company that Murdock controlled.  Thereafter, Murdock installed himself as Dole's Chairman and CEO.

In 1995, Dole divested most of the Company's non-core real estate assets by spinning them into a new company, which Murdock took private for approximately $600 million in 2000.  In 2003, Murdock took Dole private in a leveraged buyout in a transaction valued at approximately $2.5 billion.

20.    As a result of the financial crisis of 2008, Dole's business suffered, and the Company took on significant debt.  Dole then refinanced a significant portion of its debt maturing in 2009 at a high interest rate.  At the same time, Murdock's real estate ventures also suffered, causing Murdock to default on loans that he had personally guaranteed.  Because Murdock's lenders refused to modify the terms of those loans, Murdock faced the threat of collection actions.

21.    Deutsche Bank and Wells Fargo stepped in to help Murdock, purchasing the loans Murdock sought to refinance and granted the loan modifications Murdock sought.  To pay down the debt, Murdock was forced to sell a portion of Dole's equity to the public.  In October 2009, Dole conducted an IPO of approximately 41% of its shares.

22.    The newly-public Dole operated three business segments: Fresh Fruit, Fresh Vegetables and Packaged Foods.  Fresh Fruit was Dole's largest division, with revenue of $4.4 billion in 2012.  Fresh Vegetables and Packaged Foods were significantly smaller, with revenue of $1.1 billion and $1.3 billion, respectively, in 2012.  Fresh Fruit focused primarily on bananas and pineapples with smaller operations for other products, like kiwifruit.  Fresh Vegetables distributed a wide variety of fresh produce, including Dole's fresh berry business (despite the division's name), as well as packaged salads and other packaged vegetables.  Packaged Foods produced products such as canned pineapples, fruits cups, and frozen fruit.

**C.    Murdock Seeks To Take Dole Private Once Again**

23.    After Dole became public, Murdock regularly considered the possibility of taking

{FG-W0400540.}

it private again.  As Murdock would later testify, he had "never really wanted" to sell equity to the public in the first place, but believed "it was a necessity" because of the financial issues he faced.  Others at Dole recognized that Murdock did not like the public company model.  Sherry Lansing, an outside director, testified that Murdock "seemed frustrated all the time. He seemed frustrated with boards . . . . He seemed not to like the push back" of an active board, and did not even see the need to "have [outside directors] there." Murdock evidenced his distaste for the public company model in how he ran Dole.  The Chancery Court found that "Murdock was an old-school, my-way-or-the-highway controller, fixated on his authority and the power and privileges that came with it." Murdock himself testified that he was "the boss" at Dole, and "[t]he boss does what he wants to do."

24.    As part of his plan to take Dole private again, in 2012 Murdock asked Dole's CFO, Joseph Tesoriero, to provide his recommendations for an effective take-private strategy.  In response, Tesoriero prepared a two-page memorandum (the "Tesoriero Memo") describing "value creation projects currently under consideration at Dole . . . in the ideal sequence in which they should occur."  As the memo reflected, these were not hypotheticals: they were already projects "currently under consideration" to make Dole a private concern controlled by Defendant Murdock.

25.    The Tesoriero Memo contemplated a three-phase plan, the overall objective of which was for Murdock to, in the words of the Tesoriero Memo, "take [the remaining Dole] business private or . . . merge it with another company."

26.    The Chancery Court found that "the Tesoriero Memo was a candid assessment of Murdock's overall strategy" in 2012, as it showed "that Murdock's goal was to take Dole private again, and that Murdock and his team saw some form of break-up as a key step in the process.

The basic premise was to separate Dole's higher-margin businesses (predominantly Packaged Foods) from its lower margin businesses (predominantly Fresh Fruit), realize the value of the higher-margin businesses, and then pursue a transaction involving the remainder of the Company." As far as the final phase "involving the remainder of the Company," the primary option was for Murdock to buy it.

27. In furtherance of his scheme to acquire the Company, Murdock engaged in transactions to generate liquidity and reduce his overall debt, thereby strengthening his personal balance sheet for his plan to take Dole private. On April 8, 2012, Murdock entered into an agreement to sell Lanai (a private island Murdock owned through Castle & Cook) for $300 million. Similarly, in May 2012, Murdock sold an apartment he owned in New York's Upper East Side for $4.8 million.

28. Moreover, in anticipation of the take-private transaction, over the course of several weeks in late July 2012, Murdock significantly reduced the public float of Dole's common stock through an aggressive buying program. From July 24, 2012 through August 16, 2012, Murdock acquired 4.9 million Dole shares, at an average price of $12.21 per share, reducing the number of public shares by approximately 10%.

29. At that time, Deutsche Bank was already modeling a transaction to accomplish the "break up" of Dole described by the Chancery Court, with the ultimate goal of enabling Murdock to take Dole's core, high-margin business private. In April 2012, Eric Brook, the Deutsche Bank coverage officer for Dole, instructed his team to model "[a] separation of the Packaged Foods business . . . with the idea being that the Fruit/vegetable business would be a privateco . . . . The Consumer team will begin the go private analysis." The overall structure resembled the plan in the Tesoriero Memo, but with the divestiture of Packaged Foods

accomplished via a spinoff rather than a sale to a third party.

30.    To effectuate the spin-off, Dole and Deutsche Bank reached out to ITOCHU Corporation of Japan ("ITOCHU"), a company that had worked with Dole in Asia for over fifty years.  In May 2012, Murdock suggested that Dole and ITOCHU form a joint venture that would own the Asian operations of Fresh Fruit and Packaged Foods ("Dole Asia").  Negotiations shifted to that idea.

31.    In late summer of 2012, Dole's discussions with ITOCHU shifted to the possibility of ITOCHU's acquiring all of Dole Asia (the "ITOCHU Transaction").  On September 17, 2012, ITOCHU formally agreed to acquire Dole Asia for $1.685 billion in cash.  In its press release the next day announcing that transaction, the Company touted that it expected to adopt cost-saving initiatives and corporate restructuring in order to reflect the realignment of the remaining Dole business after the ITOCHU Transaction.  Dole stated that it would evaluate the clearing of any legacy costs and liabilities remaining with the Company and expected "to fully implement these measures by the end of fiscal 2013, which are expected to result in aggregate cost savings of approximately $50 million annually."

32.    In a conference call held that same day, Dole's then-CEO, David A. DeLorenzo, reiterated that the "cost savings initiative and corporate restructurings are expected to result in aggregate cost savings of approximately $50 million annually," and that "Dole expects to fully implement these measures by the end of fiscal 2013."  Similarly, Tesoriero said that "we expect to fully implement all cost savings initiatives [the $50 million annually] by the end of 2013, and enjoy the full-year run rate savings thereafter."

33.    The cost savings Dole reported on September 18, 2012 were fully supported and entirely consistent with Dole management's internal projections and the figures provided by the

{FG-W0400540.}

Company's financial advisers.  For example, in its September 5, 2012 fairness presentation to the Board, Deutsche Bank advised that Dole could achieve $50 million in annual cost savings, an estimate that Deutsche Bank had reached following extensive "due diligence discussions around it," and had evaluated "what triggered the cost savings" and "stress-tested" the estimate to "understand what the sources of those cost savings were to confirm that those made sense in the context of the separation of Dole Asia."

34.     As the Chancery Court found, the estimates achieved through the cost-saving measures that Dole provided to investors were not only fully supported by contemporaneous documents but "were arguably conservative."   Indeed, "an April 2012 analysis by Dole management estimated annual total cost savings as high as $125 million," and in January 2013, "Deloitte & Touche [] sent Defendant Carter an analysis identifying savings of $50-90 million per year."

35.     Analysts immediately appreciated the benefits of the ITOCHU Transaction and the cost savings Dole would achieve as a result.  For example, a September 18, 2012 Janney Capital Markets report recommended Dole as a "Buy" and increased its price target for the Company's common stock, praising Dole's "encouraging restructuring program to right-size the new business and eliminate unnecessary overhead" to generate $50 million in savings.

**D.     Defendants Falsely Misrepresent Dole's Business And Financial Condition In Order To Artificially Deflate The Value Of Dole Stock**

36.     The market's strong, positive reaction to Dole's disclosure of the earnings and cost-savings that would be achieved through the ITOCHU Transaction posed a problem for Murdock, who wanted to take Dole private on the cheap.  Indeed, in response to the Company's September 18 disclosures, the price of Dole's common stock reached over $14.00 per share on September 18, 2012.

12

{FG-W0400540.}

37.     As a result, Defendants developed and implemented a scheme to artificially lower the price of Dole stock by issuing a series of false and misleading statements that deflated the price of Dole stock.

38.     Murdock enlisted Carter to carry out his scheme.    As a practical matter, responsibility for day-to-day management of Dole passed to Carter in December 2012 after the closing of the ITOCHU Transaction.   Carter was Murdock's only direct report, which meant that the executive team reported to Carter.   As the Chancery Court found, Carter's job was to carry out Murdock's plans, and he did so effectively, "even ruthlessly."   With Carter able to serve as Murdock's mouthpiece, Defendants effectuated Murdock's buyout of Dole on the cheap.

39.     On January 2, 2013, the first day of the Class Period, Dole issued a press release providing revised guidance that reflected a sharp reversal from the Company's positive representations just weeks before and included specific quantitative analysis purportedly justifying Dole's revised guidance.   Specifically, Defendant Carter told investors that the cost-savings the Company had previously reported were no longer achievable, stating in the January 2 press release that "our current expectation is that pro forma ***2013 Adjusted EBITDA for the new Dole, including 2013 planned cost savings in the $20 million range, will be in the $150 - $170 million range***, with income from continuing operations, net of income taxes, in the $45 - $60 million range, assuming no major market changes."

40.     Analysts immediately accepted Defendants' statements and revised their assessment of Dole's business to incorporate drastically reduced cost savings and, consequently, lower earnings.   For example, analysts from BB&T Capital Markets noted that same day that:

> **Guidance.** We must first remark that Dole does not typically provide quantitative guidance.  In fact, we cannot recall a time since it provide IPO-related guidance in 2009 of management offering more than qualitative outlook language … Excluding the new cost savings program, we estimate management's 2013

guidance would imply the worst year for the pro forma company since 2006 …

41.     Analysts at Janney Capital Markets similarly revised their assessment of the Company in a January 2, 2013 report, noting that:

> **The Dole Cliff – Guidance Well Below Expectations.** Dole provided 2013 guidance below our expectations and noted ongoing pressure on fresh fruit earnings, sending the shares down 8%. The company expects pro forma (PF) 2013 adjusted EBITDA ("new Dole") of $150-$170M, including $20M in expected cost savings, and net income of $45-$60M, which are well below our prior expectations…. In response, we lower our projected FY13 PF adj. EBITDA to $151M from $206M, with $20M coming out of our expectation for 2013 restructuring savings (40% of $50M target from 80%) and the remainder out of our outlook for the fresh fruit business. We lower our fair value estimate to $13 (from $18) based on our new FY13E FCF per share of $1.06 ($1.59), which is driven off our FY13 projections for EBITDA (+$151M), capex (-$41M), interest (-$16M), taxes (-$8.5M), and share based comp (+$8M) that we expect will decrease.

42.     Defendants' false and misleading statements understating the Company's expected cost savings had the desired effect and immediately caused the price of Dole's common stock to plunge.  As a result of Defendants' January 2, 2013 statements, Dole's common stock price dropped from a closing price of $11.47 on December 31, 2012 to close at $9.93 on January 2, 2013.

43.     Three weeks later, on January 24, 2013, Dole issued another press release that further revised Dole's 2013 guidance downward and contained additional quantitative analysis purportedly justifying the Company's further revised projected 2013 Adjusted EBITDA. Specifically, Defendant Carter stated that "*we expect 2013 Adjusted EBITDA for the new Dole to be at the low end of the guidance range we announced on January 2, 2013*, assuming no major market changes."

44.     The January 24 press release also provided revised valuations for certain of Dole's key real estate assets, including 25,000 acres of land in Hawaii which Defendants told investors

had declined in value by approximately over $300 million inexplicably over just a four month period, based on representations that such assets were previously valued at over $500 million. As Defendant Carter told investors, "Dole currently estimates the relatively short-term monetization of the approximately 21,800 acres of land that Dole is not currently farming[] *to be in the $175 million to $200 million range*."

45.     Analysts and investors credited Defendants' representations. In a report dated January 24, 2013, Janney Capital Markets noted that "the guidance for 2013 to be at the low end of the pro forma range announced on January 2 – which was already lower than we had been expecting – suggests continued stiff headwinds in Dole's core banana business."

46.     As a result, Defendants' January 24 statements caused Dole's share price to drop, falling from a price of $10.47 on January 24, 2013 to close at $10.15 on January 25, 2013.

47.     Defendants continued to repeat the false and misleading guidance they provided to investors throughout the Class Period and made additional misrepresentations concerning Dole's business.  For example, in a press release issued on February 22, 2013, the Company reported that:

> Fresh fruit performance is continuing its declining trend, principally due to banana market conditions, and *Dole expects that 2013 Adjusted EBITDA for these businesses will be at the low end of the previously announced guidance range of $150 - $170 million*, with income from continuing operations, net of income taxes, in the $45 - $60 million range, assuming no major market changes.

48.     The February 22, 2013 press release also repeated the previously reported false valuations of Dole's Hawaiian land assets, explaining that "*targeted proceeds" for land that was valued at approximately $500 million just months earlier was now "in the $175 – $200 million range, which would exceed current book value*."

49.     Defendants' statements had the desired effect, artificially deflating the value of

Dole's stock.  Specifically, Dole's stock dropped from a closing price of $11.62 on February 22, 2013 to a closing price of $11.25 on February 25, 2013, the next trading day.

50.    On March 12, 2013, just before the close of trading, the Company held an earnings conference call with investors to discuss the Company's fourth quarter and year ended December 29, 2012 financial results.  Defendants reiterated the false and misleading 2013 guidance and projected cost savings, with Defendant Carter falsely stating that market conditions had "*led us to the lower end of our previous guidance of $150 million to $170 million* assuming no major market changes. This guidance includes expected sustainable cost savings of $20 million, $10 million of which will be contributed by corporate and the remaining $10 million from operations."

51.    Defendants provided additional false and misleading statements concerning the revised valuations of the Company's Hawaiian land assets.  Specifically, Defendant Carter said that "we have assessed our capital structure needs together with other possible internal funding resources including Dole's Hawaii landholdings on the island of Oahu where we are actively marketing the approximately 20,600 acres of land that Dole is not currently farming. We're seeking to sell as much of this land as we possibly can each year, expecting that it will take a few years to sell such a large quantity of farmland. *Targeted proceeds are in the $175 million to $200 million range*."

52.    Defendant Carter provided additional false statements to investors in order to justify the Company's downward revised guidance, falsely stating that "banana market" conditions were the driver of the downward guidance.  For example, in response to a Bank of America Merrill Lynch analyst's question concerning the primary driver of the Company's lowered guidance for 2013, Defendant Carter falsely stated:

{FG-W0400540.}

[F]rankly, what we've been seeing in the market some of the trends we've been seeing going back earlier to as I indicated 2009 but more recently 2011 into '12 and then even in the earlier part of this year, the kinds of trends we've been seeing, especially in the banana market, are the kinds of trends that led us to the low-end … frankly that's what drove us to that kind of guidance.

53.    In truth, Defendants knew the Company's true business prospects were unchanged, that the cost savings Defendants told investors would not be achieved would in fact be realized, and that Defendants revised Dole's guidance to facilitate Murdock's cheap buyout of Dole's public investors.

54.    Again, analysts immediately credited Defendants' representations and revised their assessment of the Company's business prospects.  For example, in a March 13, 2013 report titled "Dole: Darkest Before Dawn?", BB&T Capital Markets lowered their guidance for Dole, stating that "we are admittedly shocked by the deterioration in the profitability metrics of the fruit business."

55.    The market reacted swiftly to Defendants' announcements. In response to Defendants' statements, Dole's stock dropped from a closing price of $11.73 on March 12, 2013 to a closing price of $10.67 the following day.

56.    Subsequently, on May 2, 2013, after the close of trading, Dole issued and filed with the SEC a Form 8-K and accompanying press release, once again providing false and misleading statements concerning the Company's business prospects and the reasons for Dole's sharply downward revised guidance.  Specifically, Defendant Carter stated, "***Dole's first quarter performance is in line with our full-year expectations for 2013, at the low end of the guidance range of $150–$170 million*.**"   Defendant Carter also stated, "***[W]e expect second quarter Adjusted EBITDA to approximate half of first quarter Adjusted EBITDA … with lower earnings from both our fresh fruit and fresh vegetables businesses*.**"

{FG-W0400540.}

57.     Once again, the market reacted swiftly to Defendants' statements, with Dole common stock declining from a price of $10.71 on May 2, 2013 to close at $10.00 on May 3, 2013.

### E.     Defendants Cancel The Share Repurchase Program

58.     After the ITOCHU Transaction, the Board was considering whether to repurchase $25 to $200 million of the Company's shares (the "Repurchase Program") in order to increase shareholder value.

59.     On May 2, 2013, the Board discussed the potential share Repurchase Program and, that same day, the Company issued a press release disclosing that management would soon announce a "share repurchase program."   A week later, on May 9, 2013, Dole announced that the Board had approved a program to purchase $200 million of Dole's outstanding common stock.   Dole's announcement quoted Carter as saying, "[W]e believe the share repurchase program will enhance shareholder value."

60.     Murdock opposed the Repurchase Program, which would increase the price of Dole stock and make it more expensive for him to acquire the Company, and wanted the Company to cancel it.

61.     At the time the Repurchase Program was announced, Dole's Board had nine members.   Three were members of management: Murdock, Carter, and DeLorenzo.   A fourth was Murdock's son Justin.   The other five were outside directors, including Andrew J. Conrad and Dennis Weinberg.

62.     When it became clear to Murdock that both Conrad and Weinberg would not accede to his demand to terminate the Repurchase Program, Murdock left threatening messages on Conrad and Weinberg's voicemails, stating, in effect, that he would have them fired if they did not change their mind.

{FG-W0400540.}

63.     Weinberg did not change his mind.  Subsequently, Defendant Carter, at Murdock's behest, forced Weinberg to resign from the Board.

64.     With Weinberg gone, the Company swiftly reversed its position on the Repurchase Program.  On May 28, 2013, during the trading day, the Company issued and filed with the SEC a Form 8-K and accompanying press release stating that "Dole … announced the indefinite suspension of the previously announced share repurchase program for up to $200M of its outstanding common stock."  The press release quoted Carter as saying:

> [W]e have decided to use our existing funding resources to take advantage of this opportune window in the shipping industry … With the approximate $165 million investment in the ships and the drag on earnings due to significant losses in our strawberry business, the share repurchase program is being suspended indefinitely.

65.     According to the Company, rather than expend funds to repurchase shares from the public, Dole would use that money to purchase new ships (the "Ship-Build Deal"), subject to a phased delivery in the late 2015 to early 2016 time frame. Thus, Murdock and the Board purported to abandon the Repurchase Program, which would have created immediate value for Dole stockholders, purportedly in favor of the Ship-Build Deal, the benefits of which would not be realized for several years.

66.     Following the abrupt cancellation of the Repurchase Program and the announcement of the new Ship-Build Deal, the Company's stock price declined from $11.06 per share on May 24, 2013, to $10.41 per share on May 28, 2013, and to $9.27 per share by June 4, 2013, a more than 16% drop.

67.     In its opinion, the Chancery Court determined that the Company's cancelling the Repurchase Program was merely pretextual.  At trial, Carter claimed he cancelled the program because he was worried about covenants in Dole's debt, and he performed a calculation that

showed the covenants were at risk if Dole immediately spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for the ships.  That calculation was misplaced.  Dole was not obligated to spend the full $200 million on shares, and the program was authorized to be carried out over a year.  The contract for the ships called for payments spread over four years, with $32.9 million per year due in 2013 and 2014.  Moreover, in the Chancery Court's view, "Carter knew the announcement would drive down the stock price" and Carter cancelled the Repurchase Program "to spite the outside directors and teach them a lesson about who was really in charge" and, significantly, "to make Dole's stock price drop in advance of Murdock's planned merger proposal."  Accordingly, Carter's statements regarding the cancellation of the Repurchase Program, which caused the price of Dole stock to decline, were materially false and misleading.

68.    With the price of Dole's common stock hovering near a Class Period low, as Defendants intended, the Company was now primed ready for Murdock's take-private.

**F.    The Take-Private**

69.    On June 10, 2013, Murdock delivered to the Board his initial proposal to take Dole private.  Dole's stock price, due to Defendants' false and negative announcements, had most recently traded at an uncharacteristically low price of $10.20 per share, down over 30% from the $14.35 at which the stock traded before Defendants implemented their fraudulent scheme at the start of the Class Period.  Murdock's proposal contemplated a transaction at $12.00 per share.

70.    On August 12, 2013, the Board announced that Dole and Murdock had entered into and signed a definitive merger agreement pursuant to which Murdock would acquire for cash all of the outstanding shares of Dole common stock not currently beneficially held by him.  Under the terms of the merger agreement, Dole stockholders would receive $13.50 in cash for

20

each share of Dole common stock that they hold, in a transaction which (with the assumption of debt) placed the total enterprise value of Dole at approximately $1.6 billion.

71.    On October 31, 2013, the final day of the Class Period, the Company announced that its stockholders approved the merger and that the merger agreement was expected to close on November 1, 2013.

72.    The merger closed on November 1, 2013 and, at the close of business that day, Dole's shares of common stock ceased to be traded on the NYSE.

## POST-CLASS PERIOD DEVELOPMENTS AND ADMISSIONS

### A.    Defendants Maintain Through May 2015 That They Did Not Commit Fraud

73.    Following the announcement of Murdock's proposed takeover, shareholders began filing lawsuits against Defendants in the Delaware Court of Chancery, specifically plenary actions alleging breaches of fiduciary duty in connection with Murdock's take-private of Dole and statutory appraisal proceedings in connection with the fairness of the deal, *In re Dole Food Co. Inc. Stockholder Litigation*, Consolidated C.A. No. 8703-VL and *In re Appraisal of Dole Food Company, Inc.* Consolidated C.A. No. 9079-VCL.  The consolidated case was heavily litigated for more than two years, leading to a trial that took place over nine days with the parties introducing over 1800 exhibits, the testimony of ten fact witnesses and three experts, twenty-nine depositions and pre and post-trial briefs that collectively were over 600 pages long.

74.    Throughout the course of the Delaware Action, Defendants Murdock and Carter denied that they issued materially false and misleading statements to artificially depress Dole's share price.  For example, in their briefs in support of their motions for summary judgment, filed on October 24, 2014, Defendants Murdock and Carter maintained that "it is undisputed that there was nothing inaccurate about Dole's public statements" and that "[t]he earnings guidance simply reflected Dole's economic reality following stockholder approval of the ITOCHU Transaction …

leaving behind principally low-margin, highly volatile, unpredictable commodity produce businesses."[1]  Similarly, Murdock and Carter denied the pretextual nature of Dole's purchasing ships in connection with the cancellation of the stock Repurchase Program, arguing that "[t]here is no evidence that the Board's decision to implement a stock repurchase program lacked a rational business purpose."

## B.    The Delaware Court Finds That Defendants Committed Fraud

75.    Despite Defendants' arguments, on August 27, 2015, Vice Chancellor J. Travis Laster of the Delaware Court of Chancery issued his opinion, holding that Defendants Murdock and Carter had breached their fiduciary duty of loyalty to Dole's shareholders and found Murdock and Carter jointly and severally liable for damages of $148.19 million.  Specifically, Vice Chancellor Laster found that "[b]efore Murdock made his proposal, *Carter made false disclosures about the savings Dole could realize after selling approximately half of its business in 2012*."  Notably, Vice Chancellor Laster found Murdock and Carter's conduct to be "*intentional and in bad faith*" and that "*Carter engaged in fraud*."

76.    In connection with Murdock and Carter's liability, the Court of Chancery made the additional findings supporting Plaintiffs' allegations that: (i) Defendants' scheme to take Dole private was memorialized in a pre-Class Period memorandum that functioned as a step-by-step playbook for effectuating the take-private; (ii) Defendants' statements concerning "cost savings" were false; (iii) based on Dole's financial advisor's estimates and its own internal reports, Defendants knew that their cost-saving statements were false; (iv) Defendants' statements concerning the reasons for cancelling the stock Repurchase Program, initially announced for the purported purpose of increasing shareholder value, were pretextual and false; and (v) as

---

[1] Defendant Murdock joined Defendant Carter's Opening Brief In Support of Summary Judgment, filed on October 24, 2014.

Defendant Carter himself admitted, Defendants' statements concerning the cancellation of the Repurchase Program were issued for the purpose of further driving down the price of Dole's common stock.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

77.    The Class Period begins on January 2, 2013, when, in connection with the ITOCHU Transaction, Defendants began making materially false and misleading statements to artificially depress the value of Dole's common stock concerning, among other things: (i) the Company's 2013 earnings guidance; (ii) the cost savings which could be achieved through the consummation of the ITOCHU Transaction; (iii) the true value of Dole's key real estate assets; and (iv) the cancellation of the Company's stock Repurchase Program.

78.    Including and in addition to the materially false and misleading statements and omissions set forth above, Defendants made the following materially false and misleading statements and omissions during the Class Period.

79.    In connection with the announcement of the ITOCHU Transaction, and for the first time since its 2009 IPO, on January 2, 2013 Dole issued a press release containing quantitative analysis – analysis that was overwhelmingly negative and materially false and misleading.  Specifically, Defendant Carter stated in the January 2 press release that:

> [O]ur current expectation is that pro forma *2013 Adjusted EBITDA for the new Dole, including 2013 planned cost savings in the $20 million range, will be in the $150 - $170 million range*, with income from continuing operations, net of income taxes, in the $45 - $60 million range, assuming no major market changes.

80.    Moreover, in the same January 2 press release, Defendants also falsely explained the motivation for providing their lowered, albeit materially false and misleading guidance with the Company stating, "*Dole has provided earnings guidance to give investors general*

*information on the overall direction of its remaining businesses following the sale transaction*."

81.     Three weeks later, on January 24, 2013, Dole issued another press release, once again uncharacteristically containing quantitative analysis – analysis which again was overly pessimistic and materially false and misleading concerning the Company's 2013 Adjusted EBITDA.  Specifically, Defendant Carter stated that "*we expect 2013 Adjusted EBITDA for the new Dole to be at the low end of the guidance range we announced on January 2, 2013*, assuming no major market changes."

82.     As did the January 2 press release, the January 24, 2013 press release also falsely explained Dole's motivation for providing its lowered, albeit false guidance with the Company stating, "*Dole has provided earnings guidance to give investors general information on the overall direction of its remaining businesses following the sale transaction*."

83.     These statements were materially false and misleading because they failed to disclose the truth that the Company would receive significantly greater cost savings as a result of the ITOCHU Transaction, that its 2013 earnings guidance was actually significantly higher than represented, and the value of its key real estate assets was in fact worth hundreds of millions of dollars more than represented. Specifically, these statements were materially false and misleading because, as the Court of Chancery found: (i) in its fairness opinion to the Board in connection with the ITOCHU Transaction, Deutsche Bank advised Dole that it would achieve $50 million, not $20 million, in cost savings, a number which Deutsche Bank viewed as conservative; (ii) DeLorenzo, Dole's President and CEO prior to Carter's replacing him after the ITOCHU Transaction, provided the same $50 million figure in a presentation to analysts, specifically explaining that the $50 million would be achieved by the end of 2013, expectations

which were reiterated in November 2012 and again in December 2012 in a presentation to Dole's Board; (iii) in January 2013, Deloitte & Touche sent Carter an analysis identifying savings of $50 to $90 million per year; and (iv) Dole's own internal plan identified $62 million in cost savings. Moreover, Dole did not provide this guidance to give investors general information on the overall direction of its remaining businesses following the ITOCHU Transaction, but rather, as the Chancery Court found, to artificially depress the value of Dole's common stock in preparation for Murdock's take-private, an action that Murdock had been planning since 2012, as demonstrated by the Tesoriero Memo, Murdock's regular discussions with Deutsche Bank, and his preparatory sale of his own assets, including the Island of Lanai for $300 million.

84.    In the same January 24 press release, Defendants also made materially false and misleading statements concerning the valuation of certain of Dole's key real estate assets, including over 20,000 acres of land on the Island of Oahu. Specifically, Defendant Carter stated that "Dole currently estimates the relatively short-term monetization of the approximately 21,800 acres of land that Dole is not currently farming, *to be in the $175 million to $200 million range*."

85.    These statements were materially false and misleading because the land on Oahu that Dole sought to sell had just four months prior to these statements been estimated to be worth approximately over $500 million, far exceeding the range of $175 million to $200 million that the Company purportedly assessed it to be worth, and there was no rational basis for the Company's significantly depreciated valuation of this land.

86.    The following day, after the close of trading on January 25, 2013, the Company issued and filed with the SEC a Form 8-K and accompanying press release. The Form 8-K was signed by Joseph S. Tesoriero, Dole's then-Executive Vice President and Chief Financial Officer,

and the press release repeated the same materially false and misleading statements contained in the January 24, 2013 press release referenced above.

87.    Accordingly, these statements were materially false and misleading for the same reasons alleged in paragraphs 83 and 85.

88.    On February 22, 2013, in connection with ITOCHU's paying Dole a non-refundable cash deposit of $200 million in connection with the ITOCHU Transaction, Dole issued yet another press release containing false and misleading statements concerning the Company's 2013 guidance and cost savings.  Specifically, the Company stated:

> [F]resh fruit performance is continuing its declining trend, principally due to banana market conditions, and ***Dole expects that 2013 Adjusted EBITDA for these businesses will be at the low end of the previously announced guidance range of $150 - $170 million***, with income from continuing operations, net of income taxes, in the $45 - $60 million range, assuming no major market changes.

89.    Moreover, in the same February 22, 2013 press release, Defendants also falsely explained the motivation for providing their lowered, albeit false guidance with the Company stating that "***Dole has provided earnings guidance to give investors general information on the overall direction of its remaining businesses following the sale transaction***."

90.    As referenced above, these statements were materially false and misleading for the same reasons alleged herein in paragraph 83.

91.    The February 22, 2013 press release also contained materially false and misleading statements concerning Dole's lowered valuation of its Hawaiian land assets previously referenced in the January 24 press release, with the Company stating in regard to proceeds from selling these assets, recently valued at approximately $500, that "***[T]argeted proceeds are in the $175 – $200 million range, which would exceed current book value***."

92.    As referenced above, these statements were materially false and misleading for

the same reasons alleged herein in paragraph 85.

93.     On March 12, 2013, just before the close of trading, the Company held an earnings conference call with investors to discuss the Company's fourth quarter and year ended December 29, 2012 financial results.  As they had done throughout the Class Period, Defendants continued to provide overwhelmingly negative and false information concerning the Company's 2013 guidance, with Defendant Carter stating that market conditions "*led us to the lower end of our previous guidance of $150 million to $170 million* assuming no major market changes.  This guidance includes expected sustainable cost savings of $20 million, $10 million of which will be contributed by corporate and the remaining $10 million from operations."

94.     As referenced above, these statements were materially false and misleading for the same reasons alleged herein in paragraph 83.

95.     As they had previously reiterated throughout the Class Period, during the March 12 conference call, Defendants once again falsely undervalued the Company's Hawaiian land assets, with Defendant Carter stating that:

> [W]e have assessed our capital structure needs together with other possible internal funding resources including Dole's Hawaii landholdings on the island of Oahu where we are actively marketing the approximately 20,600 acres of land that Dole is not currently farming. We're seeking to sell as much of this land as we possibly can each year, expecting that it will take a few years to sell such a large quantity of farmland. ***Targeted proceeds are in the $175 million to $200 million range***.

96.     Also on March 12, 2013, after the close of trading, the Company issued and filed with the SEC its Form 10-K for fiscal year ended December 29, 2012.  The 2012 10-K was signed by Defendant Carter and contained materially false and misleading statements concerning the value of Dole's real estate assets.  Once again, the Company reiterated its artificially low and false valuation of these assets, stating that:

{FG-W0400540.}

[W]e are actively marketing the approximately 20,600 acres of land that we are currently farming in Hawaii on the Island of Oahu. We are seeking to sell as much of this land as we possibly can each year, expecting that it will take a few years to sell such a large quantity of farm and other land holdings. *Targeted proceeds are in the $175 – $200 million range, which would exceed current book value*.

97.    As referenced above, these statements were materially false and misleading for the same reasons alleged herein in paragraph 85.

98.    On May 2, 2013, after the close of trading, Dole issued and filed with the SEC a Form 8-K and accompanying press release. The May 2 Form 8-K was signed by Keith C. Mitchell, Dole's then-Vice President and Chief Financial Officer, and the press release contained false and misleading information concerning the Company's 2013 guidance.  Specifically, in this press release Defendant Carter stated, "*Dole's first quarter performance is in line with our full-year expectations for 2013, at the low end of the guidance range of $150–$170 million*."

99.    Defendant Carter also stated in the May 2 press release, "[W]e expect second quarter Adjusted EBITDA to approximate half of first quarter Adjusted EBITDA … with lower earnings from both our fresh fruit and fresh vegetables businesses."

100.    Moreover, in the same May 2 press release, Defendants also falsely explained Dole's motivation for providing its lowered, albeit false guidance, with the Company stating that "*Dole has provided earnings guidance to give investors general information on the overall direction of its remaining businesses following the sale transaction*."

101.    Also, on May 2, 2013, the Company held a conference call with financial analysts to discuss the Company's first quarter 2013 financial results, during which Defendants made materially false and misleading statements concerning Dole's 2013 guidance.  Defendant Carter falsely stated, "*Dole's first quarter performance is in line with our full-year expectations for 2013, at the low end of the guidance range of $150 million to $170 million*."

{FG-W0400540.}

102.    As referenced above, these statements were materially false and misleading for the same reasons alleged herein in paragraph 83.

103.    On May 15, 2013, before the start of trading, the Company issued and filed with the SEC a Form 8-K and accompanying press release.  The 8-K was signed by Defendant Carter, and the press release contained materially false and misleading statements concerning the resignation of Dennis M. Weinberg, a former member of the Company's Board.  Specifically, Defendants stated that the resignation of Weinberg was "***not the result of any disagreement with Dole or any matter relating to Dole's operations, policies, or practices***."

104.    This statement was materially false and misleading because Weinberg was forced to resign explicitly because he disagreed with Defendant Murdock about Murdock's tender offer plan, as Defendant Murdock himself admitted to the Chancery Court.  Specifically, because Weinberg wanted to increase shareholder value through a program of open market purchases rather than agree to Murdock's tender offer plan, Murdock was furious and did everything he could to pressure Weinberg into changing his view, including: (i) leaving threatening voicemails for Weinberg; (ii) absenting himself from Board meetings discussing the Repurchase Program; and (iii) ultimately having Carter demand Weinberg's resignation from the Board, which Murdock admitted at trial.

105.    On May 28, 2013, during the trading day, the Company issued and filed with the SEC a Form 8-K and accompanying press release.  The 8-K was signed by Defendant Carter, and the press release contained materially false and misleading statements concerning the Company's stock Repurchase Program.  Specifically the Company stated, "Dole … announced the indefinite suspension of the previously announced share repurchase program for up to $200M of its outstanding common stock."  The press release quoted Carter as saying:

{FG-W0400540.}

[W]e have decided to use our existing funding resources to take advantage of this opportune window in the shipping industry … With the approximate $165 million investment in the ships and the drag on earnings due to significant losses in our strawberry business, the share repurchase program is being suspended indefinitely.

106.    These statements were materially false and misleading because they were completely "pretextual" as the Chancery Court determined.  At trial, Carter claimed he cancelled the Repurchase Program because he was worried about covenants in Dole's debt, and he purportedly performed a calculation that showed the covenants were at risk if Dole immediately spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for the ships.  That calculation, as the Chancery Court found, was false.  Dole was not obligated to spend the full $200 million on shares, and the program was authorized to be carried out over a year.  The contract for the ships called for payments spread over four years, with $32.9 million per year due in 2013 and 2014.  The Board believed that the ship acquisition and share Repurchase Program were both feasible.  So did Bank of America Merrill Lynch, which was hired by Dole to advise on the share repurchase.  Defendant Carter even conceded that the debt covenants would not have been tripped by pursuing both initiatives, even if the ships had been paid in full and all $200 million of share repurchases were completed in May 2013.  Strikingly, as the Chancery Court found, Carter also indefinitely suspended the Repurchase Program to "spite the outside directors and teach them a lesson about who was really in charge," and, as Carter admitted, he issued these statements because he knew that they would drive down the price of Dole stock.

107.    On July 25, 2015, after the close of trading, the Company issued and filed with the SEC a Form 8-K and accompanying press release.  The 8-K was signed by Keith C. Mitchell, and the press release contained materially false and misleading statements concerning the

Company's 2013 guidance.  Specifically, the Company stated that its full year guidance was at "***the low end of the $150 - $170 million range***, assuming no major market changes."

108.     Moreover, in the same 8-K, Defendants also falsely explained the motivation for false and misleading guidance, with the Company stating, "***Dole has provided earnings guidance to give investors general information on the overall direction of its business***."

109.     As referenced above, these statements were materially false and misleading for the same reasons alleged herein in paragraph 83.

## LOSS CAUSATION

110.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive investors.  Defendants' materially false and misleading statements as set forth above artificially depressed the price of Dole's common stock and operated as a fraud or deceit on the Class, and induced the Class to sell Dole shares at prices that caused damage to the Class.  As a result of their sales of Dole's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## CLASS ACTION ALLEGATIONS

111.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who sold the common stock of Dole during the Class Period.  Excluded from the Class are Defendants and their families, directors, and officers of Dole and their families and affiliates.

112.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of September 27, 2013, Dole had 90,329,748 shares of common

stock outstanding.

113.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class which predominate over questions which may affect individual Class members include:

    a.    Whether Defendants violated the Exchange Act;

    b.    Whether Defendants omitted and/or misrepresented material facts;

    c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    e.    Whether the price of Dole common stock was artificially deflated;

    f.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

    g.    The extent of damage sustained by Class members and the appropriate measure of damages.

114.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

115.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

116.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

{FG-W0400540.}

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

117. Dole's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

118. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Dole who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

119. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

120. In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant time, the market for Dole securities was open, efficient, and well-developed for the following reasons, among others:

        a. Dole stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

    b.  As a regulated issuer, Dole filed periodic public reports with the SEC and the New York Stock Exchange;

    c.  Dole regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.  Dole was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the marketplace.

121.  As a result of the foregoing, the market for Dole securities promptly digested current information regarding Dole from all publicly available sources and reflected such information in the price of Dole stock. Under these circumstances, all sellers of Dole common stock during the Class Period suffered similar injury through their sale of Dole common stock at artificially deflated prices, and the presumption of reliance applies.

122.  Accordingly, Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Dole securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

{FG-W0400540.}

<u>COUNT I</u>
<u>For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5</u>
<u>(Against Dole, Murdock and Carter)</u>

123.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

124.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to sell Dole securities at artificially deflated prices.

125.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for Dole securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

126.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

127.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

128.    Defendants had actual knowledge of the misrepresentations and omissions of

{FG-W0400540.}

material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to falsely misrepresent Dole's true condition from the investing public and to support the artificially low prices of the Company's securities.

129.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

130.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violations Of Section 20(a) Of The Exchange Act**
**(Against The Individual Defendants)**

131.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

132.    During the Class Period, Defendants Murdock and Carter acted as controlling persons of Dole within the meaning of Section 20(a) of the Exchange Act.

133.    By reason of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of direct control of and/or supervisory involvement in Dole's day-to-day operations during the Class Period, Defendants Murdock and Carter had the power to, and did control and influence the decision making of the Company and the conduct of Dole's business, including the wrongful conduct complained of herein. Defendants Murdock and Carter were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Plaintiffs allege to be materially false and misleading. Moreover, these Defendants had a duty to disseminate accurate and truthful information regarding Dole's operations to correct any previously issued statements that had

become untrue so that the market price of Dole securities would be based upon truthful and accurate information.

134.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Murdock and Carter had direct involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations as alleged herein. Defendants Murdock and Carter were also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Dole during the Class Period.  Further, as detailed above, Defendants Murdock and Carter had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.  As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Dole within the meaning Section 20(a) of the Exchange Act.

135.    As a direct and proximate cause of Defendants Murdock and Carter's wrongful conduct as set forth in this Count, Plaintiffs and other members of the Class suffered damages in connection with their sales of Dole securities during the Class Period.

136.    By virtue of their positions as controlling persons of Dole and as a result of their own aforementioned conduct, Defendants Murdock and Dole, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

## **PRAYER FOR RELIEF**

137.    WHEREFORE, Plaintiffs pray for judgment as follows: (i) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; (ii) awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as result of Defendants' wrongdoing,

{FG-W0400540.}

in an amount to be proven at trial, including interest thereon; (iii) awarding Plaintiffs and the

Class their reasonable costs and expenses incurred in this action, including attorneys' fees and

expert fees; and (iv) awarding such equitable/injunctive or further relief as the Court may deem

just and proper.

## JURY TRIAL DEMAND

138.    Plaintiffs demand a trial by jury.

**FRIEDLANDER & GORRIS, P.A.**

*/s/ Joel Friedlander*
Joel Friedlander (Bar No. 3163)
Jeffrey M. Gorris (Bar No. 5012)
Christopher Foulds (Bar No. 5169)
Benjamin P. Chapple (Bar No. 5871)
1201 N. Market Street, Suite 2200
Wilmington, Delaware 19801
(302) 573-3500
jfriedlander@friedlandergorris.com
jgorris@friedlandergorris.com
cfoulds@friedlandergorris.com
bchapple@friedlandergorris.com

*Liaison Counsel for Plaintiffs*

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**

Gerald H. Silk
Mark Lebovitch
Avi Josefson
Michael Blatchley
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400
jerry@blbglaw.com
markl@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com

DATED: December 9, 2015                    *Counsel for Plaintiffs*

{FG-W0400540.}