IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAN ANTONIO FIRE AND POLICE PENSION FUND, FIRE AND POLICE HEALTH CARE FUND, SAN ANTONIO, PROXIMA CAPITAL MASTER FUND LTD, and THE ARBITRAGE FUND,<br><br>Plaintiffs,<br><br>v.<br><br>DOLE FOOD COMPANY, INC., DAVID H. MURDOCK and C. MICHAEL CARTER,<br><br>Defendants. | Civil Action No. 1:15-cv-1140-SLR<br><br>JURY TRIAL DEMANDED |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
John C. Browne
Katherine Sinderson
Jai Chandrasekhar
Adam D. Hollander
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400

ENTWISTLE & CAPPUCCI LLP
Vincent R. Cappucci
Arthur V. Nealon
Jordan A. Cortez
299 Park Avenue, 20th Floor
New York, New York 10171
(212) 894-7200

*Lead Counsel for Lead Plaintiffs*

FRIEDLANDER & GORRIS, P.A.
Joel Friedlander (Bar No. 3163)
Jeffrey M. Gorris (Bar No. 5012)
Christopher Foulds (Bar No. 5169)
1201 N. Market Street, Suite 2200
Wilmington, Delaware 19801
(302) 573-3500
*Liaison Counsel for Lead Plaintiffs*

DATED: June 23, 2016

## TABLE OF CONTENTS

I. INTRODUCTION ..... 2

II. JURISDICTION AND VENUE ..... 7

III. THE PARTIES ..... 8

A. Lead Plaintiffs ..... 8

B. Defendants ..... 9

1. Dole ..... 9

2. The Individual Defendants ..... 9

IV. BACKGROUND AND NATURE OF THE FRAUD ..... 11

A. Background ..... 11

1. History And Organization Of Dole ..... 11

2. Murdock Buys Dole And Intends To Keep It Private ..... 11

3. Murdock Prepares To Take Dole Private Once Again ..... 12

4. Murdock And Deutsche Bank Plan Murdock's Take-Private Strategy ..... 14

5. Dole Touts The Significant Cost Savings The Company Would Realize From The ITOCHU Transaction ..... 15

B. Defendants "Guide The Market Downward" In Order To Enable Murdock's Take-Private Scheme ..... 18

1. Defendants Issue False EBITDA Guidance In Order To Artificially Deflate The Value Of Dole Stock ..... 19

a. On The First Day Of The Class Period, Carter Issues False Negative Guidance Contradicting Dole's Prior Positive Projections ..... 19

b. Carter Reduces Cost-Savings Guidance Even Further And Falsely Informs Investors That Key Dole Assets Had Plummeted In Value ..... 21

c. Carter Reiterates False, Negative Guidance And Blames The Banana Market For Dole's Poor Projections ..... 22

d. Carter Tells Investors That Dole's Negative Guidance Is Still Accurate Despite Positive Quarterly Results ........................ 24

2. Defendants Further Deflated Dole's Stock Price By Canceling Dole's Stock Repurchase Program For "Pretextual" Reasons................. 25

a. Murdock Opposes Open-Market Repurchases And Tries To Force The Board To Adopt A Self-Tender Program .................... 25

b. Murdock Seeks To Drive The Company's Stock Price Lower By Canceling The Stock Repurchase Program ................. 29

3. Murdock Makes His Take-Private Offer After Defendants' Material Misstatements and Omissions Artificially Depressed Dole's Stock Price........................................................................... 31

4. Carter Manipulates The Special Committee Process Through Intentional Misconduct, Including Providing Materially False Financial Projections....................................................................... 32

5. Carter "Gives False Information" To The Board In Order To Facilitate Its Acceptance Of Murdock's Offer......................................... 34

6. Carter Secretly Provides Murdock And His Advisors With True And Accurate Financial And Operational Data ...................................... 38

7. Announcement Of The Take-Private Transaction ................................... 40

8. Dole's Proxy Statements.......................................................................... 43

9. Shareholders Approve The Take-Private Transaction............................. 45

V. POST-CLASS PERIOD DEVELOPMENTS AND ADMISSIONS............................... 45

A. Dole's Performance After The Close Of The Take-Private Transaction............. 45

B. Defendants Maintain Through May 2015 That They Did Not Commit Fraud ............................................................................................................ 46

C. The Delaware Chancery Court Finds That Defendants Committed Fraud........... 47

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT .................................................................. 48

A. Dole's January 2, 2013 Press Release................................................................. 49

B. Dole's January 24, 2013 Press Release And January 25, 2013 Form 8-K ........... 51

C. Dole's February 22, 2013 Press Release And February 25, 2013 Form 8-K ....... 53

D. Dole's March 12, 2013 Announcement Of Fourth Quarter And Year-End 2012 Financial Results ........ 54

E. Dole's May 2, 2013 Announcement Of First-Quarter 2013 Financial Results ........ 56

F. Dole's May 28, 2013 Form 8-K ........ 57

G. Murdock's June 10, 2013 Letter Announcing His Take-Private Offer ........ 58

H. Dole's July 25, 2013 Announcement Of Second Quarter 2013 Financial Results ........ 59

I. Dole's Proxy Statements ........ 64

1. Misstatements And Omissions Concerning The Procedural Fairness Of The Transaction ........ 65

2. Misstatements And Omissions Concerning The Cancellation Of The Stock Repurchase Program ........ 67

3. Misstatements And Omissions Concerning Management's Projections ........ 68

4. Misstatements And Omissions Concerning Murdock's Reasons For The Transaction ........ 70

VII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ........ 72

VIII. LOSS CAUSATION ........ 76

IX. CLASS ACTION ALLEGATIONS ........ 77

X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........ 78

XI. PRESUMPTION OF RELIANCE ........ 79

Lead Plaintiffs Proxima Capital Master Fund Ltd. ("Proxima"), San Antonio Fire and Police Pension Fund ("San Antonio F&P"), Fire & Police Health Care Fund, San Antonio ("San Antonio Health") and The Arbitrage Fund (collectively, "Lead Plaintiffs"), by and through their undersigned counsel, bring this federal securities class action (the "Action") on behalf of investors who sold the publicly traded common stock of Dole Food Company, Inc. ("Dole" or the "Company") between January 2, 2013 and October 31, 2013, inclusive (the "Class Period"), and who were damaged as a result of Defendants' wrongdoing as alleged herein (the "Class"). The securities claims asserted herein are alleged against Dole, Dole's Chairman and Chief Executive Officer David H. Murdock ("Murdock"), and Dole's President, Chief Operating Officer, General Counsel and Corporate Secretary and member of Dole's Board of Directors C. Michael Carter ("Carter") (collectively, "Defendants").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on, among other things, the independent investigation of its undersigned counsel. This investigation included, but was not limited to, a review and analysis of:

(i) Evidence and court filings in *In re Dole Food Co., Inc., Stockholder Litigation*, C.A. No. 8703-VCL (Del. Ch.) and *In re Appraisal of Dole Food Company, Inc.*, C.A. No. 9079-VCL (Del. Ch.), including trial transcripts from the nine-day trial of the Chancery Court Action, the August 27, 2015 post-trial Memorandum Opinion of Vice Chancellor Travis J. Laster of the Court of Chancery of the State of Delaware (the "Chancery Court");

(ii) Regulatory filings made by Dole with the United States Securities and Exchange Commission ("SEC") and related conference call transcripts concerning the Company's quarterly and annual financial results;

(iii) Analysts' reports concerning Dole and its business operations and financial results;

(iv) Data reflecting the price of Dole's common stock; and

(v) Other public material and data concerning the Company and the other Defendants.

Lead Counsel's investigation into the factual allegations contained herein is continuing.

## I. INTRODUCTION

1. This action arises out of Defendants' fraudulent scheme to artificially depress the price of Dole's common stock during the Class Period so that Defendant Murdock could acquire all outstanding publicly held shares of Dole's common stock at a significantly discounted price to Dole's true fair value. To implement that scheme, Defendants issued a series of materially false and misleading statements and omissions of material facts, including false negative financial and strategic projections, in order to "***prime[] the market for the freeze-out by driving down Dole's stock price and undermining its validity as a measure of value***."[1] (Memorandum Opinion, 2015 WL 5052214, at *2.) On November, 1, 2013, the first day after the end of the Class Period, Murdock succeeded in acquiring all public shares of Dole's common stock (the "Take-Private Transaction") at a price well below what he would have paid had the full truth about Dole's business and financial outlook been disclosed.

2. Remarkably, a court has already held Defendants Murdock and Carter liable for the misconduct alleged herein. Dole shareholders whose Dole stock Murdock acquired in the Take-Private Transaction sued Murdock and Carter in Delaware Chancery Court alleging that Murdock and Carter breached their fiduciary duties in connection with the Take-Private Transaction (the "Chancery Court Action"). After a nine-day trial (the "Chancery Court Trial"), during which over 1,800 exhibits were introduced and ten fact witnesses and three experts

---

[1] Unless otherwise stated herein, all emphasis in quoted statements is added. Citations are to pages of the Memorandum Opinion, *In re Dole Food Co. Inc., S'holder Litig.*, Nos. 8703-VCL, 9079-VCL, 2015 WL 5052214 (Del. Ch. Aug. 27, 2015).

testified, on August 27, 2015, Vice Chancellor J. Travis Laster issued his Memorandum Opinion finding that Defendants Murdock and Carter had breached their fiduciary duty of loyalty to Dole's shareholders, and holding Murdock and Carter jointly and severally liable for damages of $148.19 million. (*See id.* at *47.) Specifically, Vice Chancellor Laster found that, prior to the Take-Private Transaction, Murdock's and Carter's conduct was "***intentional and in bad faith***," and that "***Carter engaged in fraud***." (*Id.* at *2, 26.)

3. Vice Chancellor Laster concluded that the $13.50 per share that Murdock paid to take Dole private was unfairly low due to Murdock's and Carter's fraudulent scheme to depress the price of Dole's stock during the Class Period. Vice Chancellor Laster ordered that all Dole shareholders whose shares Murdock purchased in the Take-Private Transaction were entitled to an additional $2.74 per share, putting the "conservative" fair value of the Dole stock that Murdock acquired at $16.24 per share. (*Id.* at *3, 46.) Notably, Vice Chancellor Laster concluded that "responsible estimate[s]" could support up to a $20.34 per share valuation. (*Id.*)

4. This Action is on behalf of Dole shareholders who sold their stock before November 1, 2013 and were not compensated in the Chancery Court Action. The Class Period starts on January 2, 2013, when Defendants began releasing materially false, negative information designed to artificially depress the price of Dole's common stock. Specifically, in furtherance of their scheme, Defendants repeatedly made materially false and misleading statements and omissions of material facts concerning key drivers of Dole's financial results.

5. <u>First</u>, beginning on January 2, 2013, Defendants made numerous materially false and misleading statements, and omissions of material fact, concerning the cost savings that Dole expected to achieve following a strategic transaction with ITOCHU Corporation of Japan (the "ITOCHU Transaction"), which was the first step in Defendants' plan to take Dole private at an

artificially depressed price. Specifically, Defendants publicly represented that the ITOCHU Transaction would produce only $20 million in annual cost savings, leading to adjusted EBITDA guidance of approximately $150 million for 2013. In reality, as Murdock and Carter knew (and had told investors at the time of the ITOCHU Transaction), Dole management internally expected the ITOCHU Transaction to produce at least $50 million in annual cost savings – a ***60% increase*** – which, had that fact been made public, would boost earnings (and Dole's stock price) significantly. Indeed, the Chancery Court found that "before Murdock made his proposal [to take Dole private], ***Carter made false disclosures about the savings Dole could realize after selling approximately half of its business in 2012***." (*Id.* at *2.) The Chancery Court further found that Carter "***delayed [disclosing the cost savings] so that post-Merger, Murdock would benefit***" and that "***Carter's reduced estimate [of cost savings] was false***." (*Id.* at *11 n.8, 27.)

6. Second, Defendants cancelled a stock repurchase program less than three weeks after Dole announced the program, and then lied to investors about the reasons for doing so. On May 9, 2013, Dole's board of directors (the "Board") announced its approval of a program to purchase $200 million of Dole's outstanding common stock (the "Stock Repurchase Program"), which was designed to enhance shareholder value. Dole's stock price increased by nearly 5% after the announcement of the Stock Repurchase Program, which meant that Murdock would have to pay a higher price in order to take Dole private. Carter then unilaterally cancelled the Stock Repurchase Program for the false reason that Dole could not undertake the program and also make certain opportunistic capital investments in new shipping vessels to transport Dole's products. As the Chancery Court found, Carter's reason was purely "pretextual," as the planned acquisition of new ships in no way prevented the Company from continuing with the Stock Repurchase Program. (*Id.* at *2.) The Chancery Court found that Defendants' real purpose for

cancelling the Stock Repurchase Program was "***to make Dole's stock price drop in advance of Murdock's planned merger proposal***." (*Id.* at *28.) Tellingly, "***Carter knew the [cancellation] would drive down the stock price***." (*Id.*)

7. Third, Defendant Murdock solicited shareholder support for the Take-Private Transaction by falsely representing that his offer was an attempt to provide significant value to Dole shareholders, and was made only because prior alternative attempts to increase the Company's stock price had supposedly failed. On June 10, 2013, Murdock wrote a letter to the Board, which was attached to a Form 13D filed with the SEC, falsely claiming that certain management initiatives, including the ITOCHU Transaction, restructurings and improvements to existing businesses, and cost reductions "had little impact on the Company's stock price." Murdock knew, however, that the failure to raise Dole's stock price higher was a direct result of Defendants' materially false and misleading statements, and omissions of material fact, including Defendants' misrepresentations that the ITOCHU Transaction would produce only $20 million in annual cost savings, which artificially depressed the Company's stock price during the Class Period.

8. Fourth, Defendants falsely undervalued Dole's significant real-estate assets that the Company planned to sell. In September 2012, Dole publicly stated that it owned 25,000 acres of land in Oahu, Hawaii (the "Hawaiian Land") valued at over $500 million. However, four months later, in January 2013, Defendant Carter publicly stated that the Hawaiian Land was worth only "in the $175 million to $200 million range," without any reasonable basis and without offering any explanation for the 60% decline in value.

9. Fifth, Defendants failed to disclose Carter's manipulation of the process surrounding the Take-Private Transaction, including his interference with a committee of Dole's

independent directors (the "Special Committee") that the Board tasked with evaluating the fairness of Murdock's Take-Private proposal. Specifically, Carter intentionally and improperly: (i) provided "***knowingly false***" five-year management projections to the Board and the Special Committee, designed to "lowball" the true value and current and future prospects of the Company; (ii) attempted to limit the scope of the Special Committee's work; (iii) insisted on controlling any potential bidders' access to nonpublic Company information; and (iv) tried to prevent the Special Committee from retaining its own chosen advisors. (*Id.* at *2, 32.) As the Chancery Court concluded, "***Murdock and Carter's conduct throughout the Committee process . . . demonstrated that their actions were not innocent or inadvertent, but rather intentional and in bad faith***." (*Id.* at *2.)

10. In sum, in connection with Murdock's and Carter's liability, the Chancery Court found that: (i) Defendants' scheme to take Dole private was memorialized in a pre-Class Period memorandum written by Dole's then-CFO that functioned as a step-by-step playbook for effectuating the Take-Private Transaction (*see id.* at *6); (ii) Defendants' statements concerning "cost savings" were deliberately understated to give the appearance that Dole suffered from fundamental financial weaknesses, when it did not (*see id.* at *11, 27); (iii) based on Dole's financial advisor's estimates and its own internal reports, Defendants knew that their cost-saving statements were false (*see id.*); (iv) Defendants' statements concerning the reasons for cancelling the Stock Repurchase Program, purportedly for the purpose of increasing shareholder value, were pretextual and false (*see id.* at *2, 14); (v) Carter knew that the cancellation of the Stock Repurchase Program would further drive down the price of Dole's common stock (*see id.* at *14); and (vi) Defendants knew that Carter prepared and presented to the Board false and misleading five-year projections but failed to disclose in any of Dole's publicly disseminated

statements that Carter had provided Murdock's advisors with the Company's true and accurate financial data (*see id.* at *18-21).

11. Defendants' materially false and misleading statements and omissions of material fact caused the price of Dole stock to fall as low as $9.27 per common share on June 4, 2013, before Defendant Murdock made his initial lowball offer of $12.00 per share to acquire all shares of the Company that he did not already own. Class members, including Lead Plaintiffs, have suffered substantial financial losses by selling Dole's common stock at artificially depressed prices during the Class Period as a result of Defendants' wrongdoing.

12. Accordingly, Lead Plaintiffs and the Class are now entitled to recover from Defendants the damages incurred as a result of Defendants' materially false and misleading statements and omissions of material facts.

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78(t)(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.P.R. § 2401.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 12 U.S.C. § 78aa.

14. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Dole is incorporated in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. THE PARTIES

### A. Lead Plaintiffs

15. Proxima Capital Master Fund Ltd. ("Proxima") is an investment fund of Proxima Capital Management, LLC, an SEC-registered investment advisory firm. Proxima is located at 845 Third Avenue, 21st Floor, New York, New York. Prior to the Take-Private Transaction, Proxima owned and/or controlled in excess of 2% of the publicly held shares of Dole common stock. As set forth in the attached certification, Proxima sold Dole shares during the Class Period and was damaged thereby.

16. San Antonio Fire and Police Pension Fund ("San Antonio F&P") is a public pension fund located at 11603 W. Coker Loop, Suite 201, San Antonio, Texas that provides comprehensive retirement, death and disability benefits for the City of San Antonio's police officers, firefighters, retirees and their beneficiaries. As set forth in the attached certification, San Antonio F&P sold Dole shares during the Class Period and was damaged thereby.

17. Fire and Police Health Care Fund, San Antonio ("San Antonio Health") is a public health care fund located at 11603 W. Coker Loop, Suite 130, San Antonio, Texas that provides medical benefits to retired firefighters and police officers and their beneficiaries. As set forth in the attached certification, San Antonio Health sold Dole shares during the Class Period and was damaged thereby.

18. The Arbitrage Fund is a New York-based publicly traded mutual fund (NASDAQ: ARBDX) having assets under management in excess of $1.97 billion primarily investing in securities of companies involved in the announcement of public corporate transactions and managed by a team of portfolio managers having years of industry experience. The Arbitrage Fund's principal place of business is located at 41 Madison Avenue, 42nd Floor,

New York NY, 10010. As set forth in the attached certification, The Arbitrage Fund sold Dole shares during the Class Period and was damaged thereby.

**B. Defendants**

**1. Dole**

19. Dole is a Delaware corporation with its principal executive offices located at One Dole Drive, Westlake Village, California. During the Class Period, Dole stock traded on the New York Stock Exchange ("NYSE") under the stock symbol "DOLE." As of September 27, 2013, the record date for the buyout of Dole stockholders at issue in this litigation, Dole had 90,329,748 shares of common stock outstanding and a public float of 54,615,380 shares of common stock, while Defendant Murdock beneficially owned 35,823,585 shares of Dole common stock. Dole described itself as "the world's largest producer and marketer of high-quality fresh fruit and fresh vegetables" that "markets a growing line of packaged and frozen food, and is a produce industry leader in nutrition education and research." By the beginning of the Class Period, Dole had built a fully integrated operating platform in the Americas, Europe, Asia and Africa, and distributed its approximately 180 products in more than 90 countries.

**2. The Individual Defendants**

20. Defendant David H. Murdock was Dole's Chairman of the Board and CEO. Murdock joined Dole as Chairman of the Board and CEO in July 1985 and continued as Dole's CEO until June 2007. Murdock was reappointed as Dole's CEO in February 2013. Murdock took Dole private in 2003 and was its sole owner until 2009, when the Company's shares were again offered to the public. During the Class Period, Murdock was the beneficial owner of approximately 40% of Dole's outstanding stock (35,823,585 shares as of September 27, 2013), and a member of the Company's Board of Directors. Murdock was also Chairman of the Board and CEO of Dole's former parent company, Castle & Cooke, Inc. ("Castle & Cooke"), and

beneficially owned all of the capital stock of Castle & Cooke. During the Class Period, Murdock reviewed and approved Dole's press releases and public filings with the SEC that contained materially false and misleading statements, as detailed herein.

21. Defendant C. Michael Carter was Dole's President, COO, General Counsel, and Corporate Secretary, and was a member the Company's Board. Carter originally joined Dole in October 2000 as Vice President, General Counsel and Corporate Secretary. Carter joined the Board in February 2013. Carter has also served as attorney-in-fact for Castle & Cooke, the David H. Murdock Living Trust, and Murdock himself. Carter further served as Murdock's personal counsel in connection with Murdock's sale of the Hawaiian island of Lanai for a reported $300 million. During the Class Period, Carter reviewed, approved, signed, and made statements in Dole's press releases and filings with the SEC that contained materially false and misleading statements, and participated in conference calls with securities analysts during which he made materially false and misleading statements, as detailed herein.

22. Defendants Murdock and Carter are referred to herein as the "Individual Defendants." In their roles at the Company, the Individual Defendants directly participated in the management of Dole's operations and, because of their positions at Dole, were involved in the drafting, reviewing, publishing and/or disseminating the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Dole's reports to the SEC, press releases, conference calls to investors, and presentations to securities analysts, money and portfolio managers, and institutional investors. Because of their positions and access to material, non-public information, each of the Individual Defendants knew that the true facts had not been disclosed to and were being concealed from the

public, and that statements alleged herein were materially false and/or misleading when made and/or omitted material facts.

## IV. BACKGROUND AND NATURE OF THE FRAUD

### A. Background

#### 1. History And Organization Of Dole

23. Dole has its origins in Castle & Cooke, a company established in 1851 by two Hawaiian missionaries and that later became the world's largest producer of fruits and vegetables. In 1932, Castle & Cooke acquired 21% of the Hawaiian Pineapple Company, which was founded in 1901 by James Dole. Castle & Cooke acquired the balance of the Hawaiian Pineapple Company in the 1960s and was later renamed the Dole Food Company, Inc. in 1991. Dole's common stock became publicly traded and was first listed on the NYSE in 1964.

#### 2. Murdock Buys Dole And Intends To Keep It Private

24. In 1985, Murdock acquired Castle & Cooke, which was hovering near insolvency. Thereafter, Murdock installed himself as Dole's Chairman and CEO. In 1995, Dole divested most of the Company's real-estate operations by spinning them into a new company (named Castle & Cooke), which Murdock took private for approximately $600 million in 2000. In 2003, Murdock took Dole private in a leveraged buyout in a transaction that valued Dole at approximately $2.5 billion.

25. As a result of the financial crisis of 2008, Dole's business suffered, and the Company took on significant debt. Dole then refinanced a significant portion of its debt maturing in 2009 at a high interest rate. At the same time, Murdock's real-estate ventures also suffered, causing Murdock to default on loans that he had personally guaranteed. Because Murdock's lenders refused to modify the terms of those loans, Murdock faced the threat of collection actions. Deutsche Bank and Wells Fargo stepped in to help Murdock, purchasing the

loans Murdock sought to refinance and granting the loan modifications Murdock sought. To pay down the debt, Murdock was forced to sell a portion of Dole's equity to the public. In October 2009, Dole conducted an IPO of approximately 41% of its shares. Murdock disposed of another 24 million shares in November 2012 to satisfy a contractual obligation. As a result, the public float during the Class Period was approximately 60% of Dole's outstanding shares.

26. The newly public Dole operated three business segments: Fresh Fruit, Fresh Vegetables, and Packaged Foods. Fresh Fruit was Dole's largest division, with revenue of $4.4 billion in 2012, and its Fresh Vegetables and Package Foods revenues were much smaller, with revenue of $1.1 billion and $1.3 billion, respectively, in 2012.

### 3. Murdock Prepares To Take Dole Private Once Again

27. After Dole became public, Murdock regularly considered the possibility of taking it private again. As Murdock testified at the Chancery Court Trial, he had "never really wanted" to sell equity to the public in the first place, but believed "it was a necessity" because of the financial issues he faced. (Memorandum Opinion, 2015 WL 5052214, at *5.) Others at Dole recognized that Murdock did not like the public company model. Sherry Lansing, an outside director, testified that Murdock "seemed frustrated all the time. He seemed frustrated with boards . . . . He seemed not to like the push back" of an active board, and did not even see the need to "have [outside directors] there." (*Id.*) Indeed, a March 3, 2011 profile in the *New York Times Magazine* quoted Murdock stating, "'I never had a boss in my whole life,' he says, owning up to what he labels a 'dictatorial' streak. 'I've totally destroyed anybody's ability to tell me what to do.'" The Chancery Court found that "Murdock was an old-school, my-way-or-the-highway controller, fixated on his authority and the power and privileges that came with it. Murdock testified that he was 'the boss' at Dole, and '[t]he boss does what he wants to do.'" (*Id.*)

28. In 2012 Murdock asked Dole's CFO, Joseph Tesoriero, to provide his recommendations for an effective take-private strategy. In response, Tesoriero prepared a two-page memorandum (the "Tesoriero Memo") dated January 17, 2012, describing "value creation projects currently under consideration at Dole . . . in the ideal sequence in which they should occur." As the Tesoriero Memo reflected, these were not hypotheticals: they were projects already "currently under consideration" to make Dole a private concern that Defendant Murdock controlled. (*Id.* at *6.) The Tesoriero Memo, introduced into evidence in the Chancery Court Action, contemplated a three-phase plan, the overall objective of which was for Murdock to, in the words of the Tesoriero Memo, "take [the remaining Dole] business private or . . . merge it with another company." (*Id.*)

29. The Chancery Court found that "the Tesoriero Memo was a candid assessment of Murdock's overall strategy" in 2012, as it showed "that Murdock's goal was to take Dole private again, and that Murdock and his team saw some form of break-up as a key step in the process." (*Id.*) The Tesoriero Memo envisioned a three-step process needed for Murdock to take Dole private. First, Dole would complete four small transactions then underway, in which two of the deals were already completed. Second, Dole would sell its Packaged Foods and Fresh Vegetables to Hain Celestial Group – a transaction that was under consideration at that time but ultimately fell through. As events turned out, however, Dole sold Packaged Foods and the Asia operations of Fresh Fruit to ITOCHU. Finally, Murdock would "take [the remaining Dole] business private or . . . merge it with another company." (*Id.*)

30. The Chancery Court concluded that:

> The Tesoriero Memo was a candid assessment of Murdock's overall strategy. It shows that Murdock's goal was to take Dole private again, and that Murdock and his team saw some form of break-up as a key step in the process. The basic premise was to separate Dole's higher-margin businesses (predominately

> Packaged Foods) from its lower margin businesses (predominately Fresh Fruit), realize the value of the higher-margin businesses, and then pursue a transaction involving the remainder of the Company. Although Murdock was open to other ideas for the remainder, the primary option for Murdock was to buy it.

(*Id.*)

31. The Chancery Court also found that, in furtherance of his plan to acquire the Company, over the course of 2012, Murdock engaged in transactions to generate liquidity and reduce his overall debt, thereby strengthening his personal balance sheet for his plan to take Dole private. On April 8, 2012, Murdock entered into an agreement to sell Lanai (a private Hawaiian island Murdock owned through Castle & Cooke) for $300 million. (*Id.*) Similarly, in May 2012, Murdock sold an apartment he owned in New York's Upper East Side for $4.8 million.

32. Moreover, in anticipation of the Take-Private Transaction, in late July 2012, Murdock significantly increased his own ownership stake in the Company and reduced the public float of Dole's common stock through an aggressive buying program. From July 24, 2012 through August 16, 2012, Murdock acquired 4.9 million Dole shares, at an average price of $12.21 per share, reducing the number of public shares by approximately 10%.

33. In sum, as the Chancery Court concluded, over the course of 2012, "Murdock was pursuing a long-term strategy directed towards taking Dole private." (*Id.* at *9.)

**4. Murdock And Deutsche Bank Plan Murdock's Take-Private Strategy**

34. Consistent with their longstanding relationship, Deutsche Bank played a key role in helping Murdock plan his take-private strategy and putting that plan into action. At that time, Deutsche Bank was already modeling a transaction to accomplish the "break up" of Dole, with the ultimate goal of enabling Murdock to take Dole's core Fresh Produce business private. In an April 5, 2012 email marked "[f]or internal use only," Eric Brook, a Deutsche Bank Managing Director in the Global Consumer Group and the bank's coverage officer for Dole, instructed his

team to model "[a] separation of the Packaged Foods business . . . with the idea being that the Fruit/vegetable business would be a privateco . . . . The Consumer team will begin the go private analysis." (*Id.* at *7.) The overall structure resembled the plan in the Tesoriero Memo.

35. To effectuate this plan, in late spring of 2012, Dole and Deutsche Bank reached out to ITOCHU, a Japanese company that had worked with Dole in Asia for over fifty years as an importer, distributor and provider of back office services. Dole and ITOCHU explored a transaction where Dole and ITOCHU would form a joint venture that would own the Asian operations of Fresh Fruit and Packaged Foods ("Dole Asia"). In late summer of 2012, Dole's discussions with ITOCHU shifted to the possibility of ITOCHU acquiring all of Dole Asia. On September 17, 2012, ITOCHU formally agreed to acquire Dole Asia for $1.685 billion in cash – *i.e.*, the ITOCHU Transaction.

**5. Dole Touts The Significant Cost Savings The Company Would Realize From The ITOCHU Transaction**

36. On September 17, 2012, Dole issued a press release announcing the ITOCHU Transaction. In that press release, the Company announced that it expected to adopt cost-saving initiatives and corporate restructuring in order to reflect the realignment of the remaining Dole business after the ITOCHU Transaction. Dole stated that it expected "to fully implement these measures by the end of fiscal 2013, which are expected to result in aggregate cost savings of ***approximately $50 million annually***."

37. In a conference call held the next day, Dole's then-CEO, David A. DeLorenzo, reiterated that the "cost savings initiative and corporate restructurings are expected to result in aggregate cost savings of approximately ***$50 million annually***," and that "Dole expects to fully implement these measures by the end of fiscal 2013." Similarly, Tesoriero said that "we expect to fully implement all cost saving initiatives [the $50 million annually] by the end of 2013, and

enjoy the full-year run rate savings thereafter." In response to an analyst's question, Tesoriero confirmed that "the $50 million of savings that we're estimating . . . stays with us." Tesoriero also stressed that management's EBITDA projections were based on reported results from 2011, and that "we have not in the past and will not now begin to give forward-looking guidance."

38. The $50 million in cost savings that Dole reported on September 18, 2012 were fully supported and entirely consistent with Dole management's internal projections and the figures provided by the Company's financial advisers. For example, in its September 5, 2012 fairness presentation to Dole's Board, introduced at the Chancery Court Trial, Deutsche Bank advised that Dole could achieve $50 million in annual cost savings, an estimate that Deutsche Bank had reached following extensive "due diligence discussions[.]" (*Id.* at *11.) Moreover, Deutsche Bank's fairness presentation stated that the bank had evaluated "what triggered the cost savings," and "stress-tested" the estimate to "understand what the sources of those cost savings were to confirm that those made sense in the context of the separation of Dole Asia." (*Id.*) A December 2012 "Company Overview" presentation to the Dole Board, also introduced in the Chancery Court Action, identified $20 million in cost savings in 2013, $35 million annually beginning in 2014, and the full $50 million annually beginning in 2015. (*Id.*)

39. As the Chancery Court found, the estimates achieved through the cost-saving measures that Dole provided to investors were not only fully supported by contemporaneous documents but "were arguably conservative." (*Id.*) Indeed, "an April 2012 analysis by Dole management estimated annual total cost savings as high as $125 million," and in January 2013, Deloitte & Touche sent Defendant Carter an analysis identifying savings of $55-90 million per year. According to the Memorandum Opinion, Dole management had identified $62 million in specific cost-cutting initiatives. (*Id.*)

40. Analysts immediately appreciated the benefits of the ITOCHU Transaction and the cost savings Dole would achieve as a result. For example, a September 18, 2012 Janney Capital Markets report recommended Dole as a "Buy" and increased its price target for the Company's common stock, praising Dole's "encouraging restructuring program to right-size the new business and eliminate unnecessary overhead" to generate $50 million in savings.

41. In response to the Company's September 18 disclosures, the price of Dole's common stock jumped 6%, from a close of $13.79 on September 17, 2012, to close at $14.56 on September 18, 2012.

42. Over the remainder of 2012, analysts and public investors continued to focus on the significant cost savings that Dole stood to realize as a result of the ITOCHU Transaction. For example, during a conference call with analysts on November 15, 2012 to discuss the Company's third-quarter 2012 earnings, DeLorenzo stated that Dole would realize $50 million in cost savings by the end of 2014. Specifically, DeLorenzo stated that "we should be able to bring in about $20 million to $25 million in savings next year, in a full run rate. . . . The other operational savings . . . we're still working on. And we would sa[y] that we would work on those through 2013, and get up to a full run rate probably in 2014."

43. Echoing that statement, on November 16, 2012, BB&T Capital Markets ("BB&T") noted that "Dole will realize $20M - $25M in savings during 2013 and will reach a $50M run-rate by year-end." Indeed, BB&T recognized that the financial benefits and cost savings of the ITOCHU Transaction would raise the cost should Murdock attempt to take the company private. On December 11, 2012, BB&T reported that "Mr. Murdock may be laying the groundwork to pursue an LBO of the remaining businesses. . . . Murdock would need to raise just $800M to buy out remaining shareholders at a 28% premium to yesterday's close . . . .

***[I]nvestors may demand value for the in-progress $50M cost savings program, which will not be fully realized until late 2012.***"

**B. Defendants "Guide The Market Downward" In Order To Enable Murdock's Take-Private Scheme**

44. The market's strong, positive reaction to Dole's disclosure of the earnings and cost savings that would be achieved through the ITOCHU Transaction posed a problem for Murdock, who wanted to take Dole private at the cheapest price possible. As a result, Defendants developed and implemented a scheme to artificially lower the price of Dole stock by issuing a series of materially false and misleading statements, and omitted material facts, which artificially deflated the price of Dole stock during the Class Period.

45. Murdock enlisted Carter to carry out his scheme. As part of the ITOCHU Transaction, DeLorenzo had committed to leave Dole and run Dole Asia for at least two years. According to the Chancery Court, "[i]n anticipation of DeLorenzo's resignation, the Board agreed that [Defendant] Murdock would start functioning as CEO, and [Defendant] Carter would start functioning as President and COO. . . . The transition effectively took place in December 2012." (Memorandum Opinion, 2015 WL 5052214, at *10.) Defendant Carter was Murdock's only direct report, which meant that the executive team reported to Carter. As the Chancery Court found, Carter's job was to carry out Murdock's plans, and he did so effectively, "even ruthlessly." (*Id.*) With Carter able to serve as Murdock's mouthpiece, Defendants effectuated Murdock's buyout of Dole on the cheap.

### 1. Defendants Issue False EBITDA Guidance In Order To Artificially Deflate The Value Of Dole Stock

#### a. On The First Day Of The Class Period, Carter Issues False Negative Guidance Contradicting Dole's Prior Positive Projections

46. On January 2, 2013, the first day of the Class Period, Dole issued a press release providing revised guidance that reflected a sharp reversal from the Company's positive representations just weeks before, and included specific quantitative analysis purportedly justifying Dole's revised guidance. Specifically, Defendant Carter told investors that the cost savings the Company had previously reported were no longer achievable, stating in the January 2 press release that "our current expectation is that pro forma 2013 Adjusted EBITDA for the new Dole, ***including 2013 planned cost savings in the $20 million range***, will be in the $150 - $170 million range, with income from continuing operations, net of income taxes, in the $45 - $60 million range, assuming no major market changes." As the Chancery Court found, Carter's reduced projections represented a decline of "20% of Dole's forecasted EBITDA." (*Id.*) Thus, if Carter had adhered to Dole's previously announced guidance of $50 million in cost savings resulting from the ITOCHU Transaction – which it internally still expected to achieve – Dole's EBITDA guidance would have increased by 20%, to $180 - $204 million. Carter did not explain or address the $30 million discrepancy between the $50 million in cost savings previously announced and the new guidance – a decrease of ***60%***. Nor did he explain why Dole was departing from its longstanding practice to not issue forward-looking EBITDA guidance.

47. Analysts immediately accepted Defendants' statements and revised their assessment of Dole's business to incorporate drastically reduced cost savings and, consequently, lower earnings. For example, analysts from BB&T noted that same day that:

> Guidance. ***We must first remark that Dole does not typically provide quantitative guidance. In fact, we cannot recall a time since it provided IPO-related***

> ***guidance in 2009 of management offering more than qualitative outlook language***.
>
> * * *
>
> We have reduced our 2013 estimate given that the cost savings amount in 2013 will likely be lower than we had anticipated.

48. Analysts at Janney Capital Markets similarly revised their assessment of the Company in a January 2, 2013 report, noting:

> The Dole Cliff – Guidance Well Below Expectations. Dole provided 2013 guidance below our expectations and noted ongoing pressure on fresh fruit earnings, sending the shares down 8%. The company expects pro forma (PF) 2013 adjusted EBITDA ("new Dole") of $150-$170M, ***including $20M in expected cost savings***, and net income of $45-$60M, which are well below our prior expectations. . . . In response, we lower our projected FY13 PF adj. EBITDA to $151M from $206M, with $20M coming out of our expectation for 2013 restructuring savings (40% of $50M target from 80%) and the remainder out of our outlook for the fresh fruit business. ***We lower our fair value estimate to $13 (from $18)*** based on our new FY13E FCF per share of $1.06 ($1.59), which is driven off our FY13 projections for EBITDA (+$151M), capex (-$41M), interest (-$16M), taxes (-$8.5M), and share based comp (+$8M) that we expect will decrease.

49. Defendants' materially false and misleading statements understating the Company's expected cost savings had the desired effect, and immediately caused the price of Dole's common stock to plunge. As a result of Defendants' January 2, 2013 statements, Dole's common stock price dropped from a closing price of $11.47 on December 31, 2012 to close at $9.93 on January 2, 2013.

50. The timing of Defendants' January 2, 2013 announcement that guidance was significantly lower than previously forecast was no accident, as it came at the same time that Murdock was deciding on his take-private strategy. Just days later, on January 11, 2013, Deutsche Bank sent Dole's Treasurer, Beth Potillo ("Potillo"), a presentation that modeled different options for a Murdock freeze-out, each of which assumed a purchase price of $12.00 per share. As the Chancery Court discussed in its post-trial Memorandum Opinion, "[t]he timing

of [Carter's] announcement on January 2 suggests the real reason. It came just after Deutsche Bank renewed its discussion with Murdock about the freeze-out . . . . Carter made the announcement just as internal discussions about the freeze-out were heating up." (2015 WL 5052214, at *11 (citation omitted).)

**b. Carter Reduces Cost-Savings Guidance Even Further And Falsely Informs Investors That Key Dole Assets Had Plummeted In Value**

51. Three weeks later, on January 24, 2013, Dole issued another press release (the "January 24, 2013 Press Release") that further revised Dole's 2013 guidance downward and contained additional quantitative analysis purportedly justifying the Company's revised projected 2013 Adjusted EBITDA. Specifically, Defendant Carter stated that "we expect 2013 Adjusted EBITDA for the new Dole to be at ***the low end of the guidance range we announced on January 2, 2013***, assuming no major market changes."

52. The January 24, 2013 Press Release also provided revised valuations for certain of Dole's key real estate assets, including 25,000 acres of Hawaiian Land that Defendants told investors had declined in value by over $300 million over just a four month period. Specifically, on September 17, 2012, Dole filed a Form 8-K with the SEC announcing the definitive agreement to the ITOCHU Transaction and attaching a slide presentation titled "Sale of Worldwide Packaged Foods and Asia Fresh Produce Businesses." In a discussion of Dole's "Valuable Asset Base," the presentation identified "[o]ver $500 million [fair market value] of non-core assets (e.g. idle land)." However, in the January 24, 2013 Press Release, Dole told investors that it estimated the value of the Hawaiian Land "***to be in the $175 million to $200 million range***" – an unexplained decrease of ***over 60%*** in the value of these significant assets.

53. Analysts and investors credited Defendants' representations. In a report dated January 24, 2013, Janney Capital Markets noted that for "the guidance for 2013 to be at the low

end of the pro forma range announced on January 2 – which was already lower than we had been expecting – suggests continued stiff headwinds in Dole's core banana business." Defendants' January 24, 2013 statements concerning EBITDA guidance and the Hawaiian Land had their intended effect and caused Dole's share price to drop, falling from a price of $10.47 on January 24, 2013 to close at $10.15 on January 25, 2013.

54. At the same time that Carter was issuing these unequivocal negative statements to investors, Dole's internal projections continued to anticipate cost savings at or beyond the $50 million level announced previously. Indeed, as the Chancery Court found, on January 29, 2013, in-house accountants sent Defendant Carter a summary of Dole's revised 2013 budget that identified ***$62 million*** in specific cost-cutting initiatives. (Memorandum Opinion, 2015 WL 5052214, at *11.) In furtherance of Murdock's scheme, Dole's in-house accountants included a note to Carter that "Corporate will increase the budget by $2,088K so that total savings for the company will remain at $20M." In other words, Dole's accountants manipulated internal budgets in order to keep projected savings at only $20 million, while recognizing the likelihood of $62 million in cost savings.

**c. Carter Reiterates False, Negative Guidance And Blames The Banana Market For Dole's Poor Projections**

55. Defendant Murdock and his management team continued to take key strategic planning steps in furtherance of Murdock's take-private efforts at the same time as Defendants introduced false information into the market to drive Dole's stock price down.

56. On March 12, 2013, just before the close of trading, the Company held an earnings conference call with investors to discuss the Company's fourth quarter and year ended December 29, 2012 financial results. Defendants reiterated the materially false and misleading 2013 guidance and projected cost savings, with Defendant Carter falsely stating that market

conditions had "***led us to the lower end of our previous guidance of $150 million to $170 million*** assuming no major market changes. This guidance includes expected sustainable cost savings of $20 million[.]"

57. Defendants provided additional materially false and misleading statements concerning the revised valuations of the Hawaiian Land. Specifically, Defendant Carter said that "we have assessed our capital structure needs together with other possible internal funding resources including Dole's Hawaii landholdings on the island of Oahu where we are actively marketing the approximately 20,600 acres of land that Dole is not currently farming. We're seeking to sell as much of this land as we possibly can each year, expecting that it will take a few years to sell such a large quantity of farmland. ***Targeted proceeds are in the $175 million to $200 million range***."

58. On the March 12, 2013 conference call, analysts expressed confusion regarding the Company's downward revised guidance. An analyst from Three Court stated bluntly that "carving off half the business and only coughing up $20 million of cost savings seems a little low." After a BB&T analyst asked whether Carter anticipated, on top of $20 million in cost savings for 2013, "the remaining $30 million . . . in 2014," Carter falsely responded, "No." Carter continued by stating that "these programs remain in still a developmental stage at the moment," and "I think the best I can do right now is you could certainly count on this $20 million continuing."

59. Defendant Carter also falsely stated that "banana market" conditions were the driver of the downward guidance. For example, in response to a Bank of America Merrill Lynch ("BAML") analyst's question concerning the primary driver of the Company's lowered guidance for 2013, Defendant Carter falsely stated:

> [F]rankly, what we've been seeing in the market some of the trends we've been seeing going back earlier to as I indicated 2009 but more recently 2011 into '12 and then even in the earlier part of this year, the kinds of trends we've been seeing, especially in the banana market, are the kinds of trends that led us to the low-end . . . frankly that's what drove us to that kind of guidance. . . . It's just a continued North American banana pricing.

60. In truth, Defendants knew that the Company's true business prospects were unchanged, that the cost savings Defendants told investors would not be achieved would in fact be realized, and that Defendants revised Dole's guidance to facilitate Murdock's unfair, low-priced buyout of Dole's public investors.

61. Again, analysts immediately credited Defendants' representations and revised their assessment of the Company's business prospects. For example, in a March 13, 2013 report titled "Dole: Darkest Before Dawn?," BB&T lowered its guidance for Dole, stating that "we are admittedly shocked by the deterioration in the profitability metrics for the fruit business."

62. The market reacted swiftly to Defendants' announcements. In response to Defendants' statements, Dole's stock dropped from a closing price of $11.73 on March 12, 2013 to a closing price of $10.67 the following day.

#### d. Carter Tells Investors That Dole's Negative Guidance Is Still Accurate Despite Positive Quarterly Results

63. On May 2, 2013, after the close of trading, Dole issued a press release announcing Dole's first quarter 2013 financial results. Although Dole's adjusted EBITDA of $68 million (excluding a significant one-time charge) compared favorably to the $44 million quarterly earnings from one year before, Defendant Carter again managed to suppress market expectations. Specifically, Defendant Carter stated, "Dole's first quarter performance is in line with our full-year expectations for 2013, at the low end of the guidance range of $150–$170 million." Defendant Carter also stated, "***[W]e expect second quarter Adjusted EBITDA to approximate***

***half of first quarter Adjusted EBITDA . . . with lower earnings from both our fresh fruit and fresh vegetables businesses***."

64. Once again, the market reacted swiftly to Defendants' statements, with Dole common stock declining from a price of $10.71 on May 2, 2013 to close at $10.00 on May 3, 2013.

**2. Defendants Further Deflated Dole's Stock Price By Canceling Dole's Stock Repurchase Program For "Pretextual" Reasons**

65. In early 2013, with his sights set on taking Dole private, Murdock and Carter went to Deutsche Bank for advice on how Murdock should carry out his plan. They considered whether and how to reduce Dole's public float by repurchasing public shares. How Dole moved forward with a share repurchase – *i.e.*, through open-market purchases or through a self-tender – would affect the market price of Dole common stock, the repurchase price for the Company, and the speed with which the Company could re-acquire shares. As soon became evident, Murdock and the independent directors on the Dole Board had very different opinions about the potential share repurchases.

**a. Murdock Opposes Open-Market Repurchases And Tries To Force The Board To Adopt A Self-Tender Program**

66. After the announcement of the ITOCHU Transaction, the Board was considering whether to repurchase $25 to $200 million of the Company's shares in order to increase shareholder value. As a general matter, stock repurchase programs enable companies to maximize shareholder return by removing shares from the market, thereby increasing shareholders' stake. Also, because share repurchases communicate the company's confidence in its future performance, stock prices frequently rise pursuant to a repurchase program of a company's stock.

67. The market had anticipated a possible Dole share repurchase program at least since the September 2012 announcement of the ITOCHU Transaction, and analysts recognized the significant value to shareholders that a repurchase program represented. For example, on September 18, 2012, Janney Capital Markets reported a fair value estimate for Dole stock of $19 per share, attributing $6 per share to a potential share repurchase.

68. Throughout the early part of 2013, the Board had not yet decided whether to conduct a share repurchase program through a self-tender or to purchase Dole shares in the open market. Either option would reduce Dole's public float and thereby make it easier for Murdock to take the Company private. In a self-tender, Dole would purchase a large volume of shares quickly, but would pay a premium to shareholders above market value. However, it would not have the long-term effect of raising Dole share prices, and would be less likely to impact Murdock's planned Take-Private Transaction. Conversely, if Dole pursued open-market purchases, it would not pay a premium; however, the purchases would take place over a long timeframe over which Dole would take the risk that the stock price might rise even above the price Dole would pay in a self-tender.

69. On or around January 9, 2013, Murdock and Carter met with Deutsche Bank to discuss the impact of Dole's share repurchase options on Murdock's ownership stake and his ability to gain majority control. On January 25, 2013, Deutsche Bank sent Potillo a presentation, marked "Confidential," setting forth a "Comparison of financing alternatives" and discussing the effect of a share repurchase program on Murdock's take-private attempt.

70. On February 8, Deutsche Bank's Eric Brook sent Defendant Carter and Potillo "adjusted share repurchase materials," which warned that open-market purchases posed a "[r]isk of price appreciation given the long time frame" because "[p]urchases will drive up market price

over time." As the Chancery Court found, "[d]escribing the price appreciation as a 'risk' showed where Deutsche Bank's loyalties lay. Price appreciation was a risk to Murdock for taking the company private. It was not a risk for Dole or its stockholders, who would benefit from the higher price." (Memorandum Opinion, 2015 WL 5052214, at *12.)

71. As result, according to the Chancery Court, Murdock determined that he favored the self-tender option. (*Id.*)

72. At the time, Dole's Board had nine members. Three were members of management: Murdock, Carter, and DeLorenzo. A fourth was Murdock's son Justin. The other five were outside directors, including Andrew J. Conrad ("Conrad") and Dennis Weinberg ("Weinberg"). Because the outside directors were a majority of the Board, Murdock needed at least some of their support in order to move forward with a self-tender. But Conrad and Weinberg opposed the self-tender, believing that open-market purchases would be "better for Dole and its public investors." Indeed, bankers from BAML, which advised the Board on the Stock Repurchase Program, internally termed a self-tender "ridiculous and terrible corporate finance." (*Id.*)

73. As usual, Murdock expected to get his way, and was furious at Conrad's and Weinberg's opposition to the self-tender. According to the Chancery Court, "[e]ventually Conrad told Murdock bluntly that he thought Murdock was trying to get a majority of the shares and that Conrad would not let him do it through a self-tender." (*Id.*) When it became clear to Murdock that both Conrad and Weinberg would not accede to his wishes, Murdock left threatening messages on Conrad's and Weinberg's voicemails stating, in effect, that he would force them off the Dole Board if they did not change their mind. On May 4, 2013, Murdock left a message for Conrad stating:

> Hello, Dr. Conrad. David [Murdock]. I'd like to talk to you. I'm in New York at [telephone number]. I wanted to talk with you about what's going on [with] you and Denny Weinberg. I can't believe that you are opposed to the most, very good thing for the company, and I cannot imagine why you would be opposing it, but it sure as hell pisses me off to think that you didn't call me and tell me what it is going on with you. I'm not accustomed to having a friend double-cross me but if that has happened . . .

(*Id.*)

74. Conrad's voicemail stopped recording at that point. Murdock testified in the Chancery Court Trial that he ended his message with what Vice Chancellor Laster described as "the suddenly conciliatory conclusion, then 'I'll go your way.'" Vice Chancellor Laster found Murdock's testimony "not credible." (*Id.* at *13.)

75. On May 8, 2013, the Board met without Murdock and decided to move forward with open-market repurchases rather than Murdock's preferred self-tender. On May 9, 2013, Dole announced that the Board had approved a program to purchase $200 million of Dole's outstanding common stock. Dole's announcement quoted Defendant Carter as saying, "[W]e believe the share repurchase program will enhance shareholder value." Dole's stock price leapt nearly 5% in reaction to the news, to close at $10.91 per share.

76. The Memorandum Opinion describes how, after that vote, Murdock left a similar message for Weinberg as he had for Conrad. In his trial testimony, Weinberg described the message as "not for public consumption," and Conrad called the message "stronger than mine." (*Id.*) According to Weinberg, Murdock's message stated, "if you think you're trying to take over my company, you won't be successful. Nobody needs you, including me, and we'll talk about that more when you call me." (*Id.*) Subsequently, Defendant Carter, at Murdock's behest, forced Weinberg to resign from the Board, citing a "lack of collegiality at the board level" due to Weinberg's "personality clash" with Murdock. Weinberg resigned from Dole's Board on May 14, 2013. (*Id.*)

77. On May 15, 2013, before the start of trading, the Company issued and filed with the SEC a Form 8-K and accompanying press release. The 8-K was signed by Defendant Carter, and stated that the resignation of Weinberg was "***not the result of any disagreement with Dole or any matter relating to Dole's operations, policies, or practices***." That statement was false, as Weinberg was forced to resign because he disagreed with Defendant Murdock about the Stock Repurchase Program, as Murdock himself admitted to the Chancery Court.

**b. Murdock Seeks To Drive The Company's Stock Price Lower By Canceling The Stock Repurchase Program**

78. Murdock was set to make an offer to freeze out Dole's public investors, but wanted to be as certain as possible that he did so when Dole's share price was lower rather than higher. To that end, internal Deutsche Bank emails on May 23, 2013 indicate that Murdock told Deutsche Bank he would "stand down for a few weeks to watch the share price," because "share price was down pretty big [today] and perhaps he thought it was the beginning of a trend."

79. Once they forced Weinberg off the Board, Murdock and Carter made sure that even if Dole did not move forward with a self-tender, neither would it continue the open-market Stock Repurchase Program. Indeed, less than three weeks after announcing it, Company swiftly cancelled the Stock Repurchase Program. On May 28, 2013, during the trading day, the Company issued and filed with the SEC a Form 8-K and accompanying press release stating that "Dole . . . announced the indefinite suspension of the previously announced share repurchase program for up to $200M of its outstanding common stock." The press release quoted Carter as saying:

> [W]e have decided to use our existing funding resources to take advantage of this opportune window in the shipping industry . . . . With the approximate $165 million investment in the ships and the drag on earnings due to significant losses in our strawberry business, the share repurchase program is being suspended indefinitely.

80. According to the Company, rather than expend funds to repurchase shares from the public, Dole would use that money to purchase new ships (the "Ship Acquisitions"), subject to a phased delivery in the late-2015 to early-2016 timeframe. Thus, Murdock and the Board abandoned the Stock Repurchase Program, which would have created immediate value for Dole stockholders, purportedly in favor of the Ship Acquisitions, the ostensible benefits of which would not be realized for several years.

81. Carter never informed the Board about his decision to unilaterally suspend the Stock Repurchase Program, and the outside directors learned of the Program's cancellation only from public sources. However, Carter knew that canceling the Stock Repurchase Program would cause Dole's share price to decline, as he told Board member Elaine Chao on June 4, 2013 that "we did expect a negative reaction especially from those betting on the stock price appreciating due to the share repurchase announcement." Indeed, following the abrupt cancellation of the Stock Repurchase Program and the announcement of the Ship Acquisitions, the Company's stock price declined from $11.06 per share on May 24, 2013 to $10.41 per share on May 28, 2013, and to $9.27 per share by June 4, 2013, a more than 16% drop.

82. In its Memorandum Opinion, the Chancery Court determined that the Company's purported reasons for cancelling the Stock Repurchase Program were purely "pretextual." (2015 WL 5052214, at *2, 14.) In the Chancery Court Trial, Carter claimed that he canceled the Program out of concern about covenants in Dole's debt, and that Carter had performed a calculation that showed the covenants were at risk if Dole immediately spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for the ships. But that calculation was misplaced. Not only was Dole not obligated to spend the full $200 million on shares, but the Stock Repurchase Program was authorized to be carried out over a year. Further,

the contract for Dole's new ships called for payments spread over four years, with $32.9 million per year due in 2013 and 2014. Carter conceded at the Chancery Court Trial that the debt covenants would not have been tripped by pursuing both initiatives, even if the ships had been paid in full and all $200 million of share repurchases were completed in May 2013. (*Id.* at *14.)

83. Moreover, the Chancery Court found that "Carter knew the announcement would drive down the stock price" and Carter cancelled the Stock Repurchase Program "to spite the outside directors and teach them a lesson about who was really in charge" and, significantly, "to make Dole's stock price drop in advance of Murdock's planned merger proposal." (*Id.* at *28.) Accordingly, Carter's statements regarding the cancellation of the Stock Repurchase Program, which caused the price of Dole stock to decline, were materially false and misleading.

84. With the price of Dole's common stock hovering near a Class Period low, as Defendants intended, the Company was now primed for Murdock's offer.

**3. Murdock Makes His Take-Private Offer After Defendants' Material Misstatements and Omissions Artificially Depressed Dole's Stock Price**

85. On June 10, 2013, Murdock delivered to the Board his initial proposal to take Dole private. Dole's stock, due to Defendants' false and negative announcements, had most recently traded at an uncharacteristically low price of $10.20 per share, down over 30% from the $14.35 at which the stock closed on September 20, 2012, days after Dole announced the ITOCHU Transaction. The announcement of the ITOCHU Transaction and Dole's positive first quarter 2013 financial results, among other factors, should and would have driven Dole's share price up had it not been for Murdock's and Carter's material misrepresentations and omissions, described herein, that caused artificial deflation in Dole stock. In other words, at the time Murdock made his offer, Dole stock was severely artificially deflated, and should have been trading substantially higher. Murdock's proposal contemplated a transaction at $12.00 per share.

86. In his letter to the Board, which was attached to a Form 13D filed with the SEC on June 10, 2013, Murdock falsely represented that his take-private offer was an attempt to provide significant value to Dole shareholders, and was made only because prior attempts to increase the Company's stock price had supposedly failed. Murdock wrote:

> As you know, the Company has focused on enhancing shareholder value through such measures as the sale of the Company's Asia fresh produce business and global packaged food business, restructurings and improvements to existing businesses, cost reductions, and investments in additional businesses. ***These initiatives have had little impact on the Company's stock price***, which has declined 21% since September 11, 2012, the day prior to published reports of the Company's transaction with ITOCHU . . . .
>
> I believe the stock's performance is impacted by a variety of factors, including the fact that the Company deals in perishable commodities which are subject to external factors . . . . [G]rowing the Company for the long-term will require significant investment, some of which will not generate near-term returns. Therefore, after much consideration, I believe that providing a premium to existing shareholders and operating Dole Food Company as a private enterprise is the best alternative given the public-market focus on short-term earnings and predictable quarterly results.

87. At the time, however, Murdock knew that Dole management expected the ITOCHU Transaction to produce cost savings in line with the Company's initial $50 million projections, and that the Company's share price had suffered due to Defendants' materially false and misleading statements concerning projected false savings and the cancellation of the Stock Repurchase Program on false, pretextual grounds.

### 4. Carter Manipulates The Special Committee Process Through Intentional Misconduct, Including Providing Materially False Financial Projections

88. Following Murdock's take-private bid for Dole, the Company's Board formed the Special Committee, chaired by Conrad and comprising Dole's four independent directors (Conrad, Elaine Chao, Sherry Lansing, and E. Rolland Dickson), to evaluate Murdock's

proposal. However, Carter repeatedly sought to thwart the Special Committee's independent consideration of the proposed take-private proposal.

89. First, Carter fought to limit the Special Committee's authority to evaluate only Murdock's proposal, and not any other alternative transactions. As Conrad testified at the Chancery Court Trial, Carter "hammered on" these issues with the "intention to try to limit the scope of what the [Special] Committee could do." (Memorandum Opinion, 2015 WL 5052214, at *16.)

90. Second, Carter insisted on controlling the terms of the non-disclosure agreements that the Special Committee would sign with any other potential bidders. The Chancery Court found that Carter was "clearly in the wrong," as the Special Committee – and not Carter – was empowered to act on Dole's behalf in exploring a potential strategic transaction. (*Id.* at *17.) The Special Committee conceded this issue to Carter, and thus Carter knew whenever the Special Committee provided confidential information to an interested potential bidder. As the Chancery Court put it, "Carter nominally worked for Dole, but he really worked for Murdock, so Murdock knew as well." (*Id.*)

91. Third, Carter tried to prevent the Special Committee from retaining independent advisors of its own choosing. The Special Committee hired Sullivan & Cromwell LLP ("Sullivan & Cromwell") and Richards Layton & Finger, P.A. as its legal counsel, and Lazard Frères & Co. LLC ("Lazard") as its financial advisor. Carter objected to Lazard because he wanted the Special Committee to hire BAML, which had a longstanding relationship with Dole. In addition, Carter complained that the Special Committee had not given him a draft of Lazard's engagement letter before signing, that the twelve-month engagement period for which the Special Committee retained Lazard was too long, and that the engagement letter contemplated

that Lazard would explore alternative transactions. Carter argued that "Lazard [was] incentivized to go well beyond Murdock's proposal and the Board's intended scope of the Special Committee." To that end, Carter forced the Special Committee and Lazard to remove from their agreement the reference to a twelve-month engagement and the detailed description of alternative transactions.

92. Analysts believed that Murdock would likely be successful given the Company's "challenged" circumstances, with BB&T reporting on June 11, 2013 that "there could be a willingness on Murdock's part to move his purchase price higher, but investors should not get too carried away, in our opinion, as company-specific fundamentals could remain challenged over the near-term, and we believe a competitive bid . . . is unlikely."

**5. Carter "Gives False Information" To The Board In Order To Facilitate Its Acceptance Of Murdock's Offer**

93. Even once its work was underway, Carter continued to interfere with and attempt to control the Special Committee, including by using his control over Dole's management to provide "false" financial information and projections to the Special Committee.

94. Ordinarily, on an annual basis, Dole prepared three-year budgets and financial projections using a "bottom-up process" that typically began in late summer and continued through the fall. That process started with the operating divisions, which created detailed models and projections for Dole's management. Dole's senior management would then generate the final numbers based on those bottom-up figures. Dole had prepared a set of three-year projections in December 2012 using the standard process (the "December Projections"), which it had provided to its lenders in April 2013 in connection with refinancing Dole's debt after the ITOCHU Transaction.

95. After Lazard's retention, the Special Committee provided Lazard with the December Projections. Lazard asked Dole's management to update the projections to reflect Dole management's "current best views about the prospects of [the] business," and to extend the projections for five years.

96. Carter took control of revising the December Projections and called together management for a two-day meeting on July 9 and 10, 2013. He instructed division heads to create modified projections from the "top-down," instead of using Dole's usual bottom-up process. In doing so, rather than generating a complete set of projections with supporting profit-loss statements, Carter and his team created only high-case and low-case adjusted EBITDA forecasts. Carter told the division heads to reverse engineer the supporting budgets after the meeting, which they did not complete until July 22, 2013.

97. Despite lacking the supporting budgets for the new five-year management projections, on July 11, 2013 Carter presented the ostensibly current "July Projections" to the Board and the Special Committee. As Lazard later described in an August 11, 2013 presentation to the Special Committee, the July Projections were "[p]repared on [a] 'top-down' basis rather than 'bottom-up,'" and were "[p]repared over a relatively short period of time and may not have been subject to [the] usual senior management 'give-and-take' of [the] regular budgeting process." Moreover, as Lazard noted, the July Projections were "[f]ocused primarily on EBITDA metric." Notably, the EBITDA figures in the July Projections that Carter presented to the Board and Special Committee were the same high-case and low-case figures that Carter had provided to management on July 9, meaning that the EBITDA forecast that went to the Board did not actually incorporate input from Dole's division heads.

98. The July Projections were significantly weaker than the December Projections. The July Projections reduced the projected EBITDA for year three from that contained in the December Projections by over 20%, from $211.9 million to $169.2 million. In fact, the July Projections were so poor that Lazard did not even think they would support Murdock's $12.00 per share offer. As a result, Conrad concluded that the projections were not "an accurate representation of the value of the Company."

99. The Chancery Court focused on two particularly problematic aspects of the July Projections. First, the July Projections included only $20 million out of the $50 million in post-ITOCHU Transactions cost savings that Deutsche Bank had validated and DeLorenzo had originally predicted. As alleged in Paragraphs 46-64, that reduction was totally unsupported.

100. Second, the July Projections did not forecast that Dole would receive any additional income from the purchase of farms, despite the fact that, at the time Carter prepared the July Projections, Dole management had identified the need to acquire additional farms to protect profits by sourcing products from Dole's own farms, rather than buying products from third parties. Given the changing dynamics involved in sourcing fruit from overseas farms, Dole would no longer be able to succeed by primarily acting as a middleman between farms and a domestic distribution market. Accordingly, as the Chancery Court noted, purchasing additional farms was "a strategic imperative" for Dole going forward. (Memorandum Opinion, 2015 WL 5052214, at *19.)

101. Before the ITOCHU Transaction, Dole had plans to purchase additional farms in Latin America. In October 2012, the Board approved the acquisition of 2,328 hectares of banana farms in Ecuador for $58.9 million, which Dole estimated would generate $15 million per year in incremental income. Dole expected that investing in other new farms similarly would "improve

[Dole's] average fruit cost . . . and margins." Although Dole delayed the farm purchases because of cash flow restrictions, the ITOCHU Transaction gave Dole the financial resources to resume its purchases. Indeed, throughout 2013, Dole sought to use capital that it had acquired in the ITOCHU Transaction to purchase additional farms. For example, Dole's Ecuador division assembled a request in June 2013 to invest $27.6 million "to purchase 1,102 [hectares] of land and banana plantings as part of a total expansion master plan of 2,328 [hectares]." The request included a background section that began, "Dole's strategic plan for Latin America is based on a permanent search for the most efficient source mix. The sale to [ITOCHU] gave us the financial resources to consider increasing our company farms in both bananas and pineapples. . . . It is imperative in order to improve our average fruit cost, and our margins to invest in highly efficient farms." Dole bought approximately half of its targeted farms in Ecuador before the remaining purchases were suspended because of a tax dispute with Ecuadorian authorities. However, Dole had identified opportunities in Guatemala and Costa Rica that would be equally advantageous. As the Chancery Court aptly put it, "Dole was interested in good deals on farms wherever it could find them." Yet, the July Projections did not contain any incremental income from the farm purchases despite Dole's "permanent search" for farms in "Latin America and beyond." (*Id.*)

102. The Special Committee was hamstrung because, without accurate information from Dole management, the Special Committee could not meaningfully represent shareholders in negotiating for a higher price from Murdock. As the Chancery Court wrote in its post-trial Memorandum Opinion,

> ***[W]hat the Committee could not overcome, what the stockholder vote could not cleanse, and what even an arguably fair price does not immunize, is fraud.*** Before Murdock made his proposal, Carter made false disclosures about the savings Dole could realize after selling approximately half of its business in 2012.

> He also cancelled a recently adopted stock repurchase program for pretextual reasons. These actions primed the market for the freeze-out by driving down Dole's stock price and undermining its validity as a measure of value. Then, after Murdock made his proposal, Carter provided the Committee with lowball management projections. . . . Critically . . . , the Committee never obtained accurate information about Dole's ability to improve its income by cutting costs and acquiring farms[.]
>
> Murdock and Carter likewise deprived the stockholders of their ability to consider the Merger on a fully informed basis and potentially vote it down. ***Murdock and Carter's conduct throughout the Committee process, as well as their credibility problems at trial, demonstrated that their actions were not innocent or inadvertent, but rather intentional and in bad faith.***

(2015 WL 5052214, at *2.)

103. Accordingly, the Chancery Court concluded that "[t]he projections Carter provided were knowingly false," and "Carter intentionally tried to mislead the Committee for Murdock's benefit." The Court further found that Carter "***engaged in fraud, misrepresentation, self-dealing, and gross and palpable overreaching***," which "foreclosed the ability of the stockholders to protect themselves by voting down the deal." (*Id.* at *38.)

#### 6. Carter Secretly Provides Murdock And His Advisors With True And Accurate Financial And Operational Data

104. In stark contrast to the false July Projections that Carter provided to Lazard and the Special Committee, on July 12, 2013, Carter held a lender meeting (the "Lender Meeting") with Murdock's legal and financial advisors where he provided accurate, positive information concerning Dole's operational and financial prospects in order to secure the financing for Murdock's take-private offer. Carter had at least fourteen members of Dole's senior management attend the Lender Meeting, along with multiple representatives from Deutsche Bank, BAML, and Scotiabank. However, Carter did not tell the Special Committee or its advisors about the Lender Meeting.

105. As the Chancery Court wrote, "[t]he contrast between what Carter told the Committee and what he told Murdock's lenders and advisors . . . confirms the fraudulent nature of the July Projections." (*Id.* at *31.) Although Carter initially testified in the Chancery Court Trial that the purpose of the July 12 Lender Meeting was to update Dole's existing lenders about the Company's performance and not to talk about Murdock's proposed Take-Private Transaction, Carter conceded that this was false when confronted with evidence to the contrary.

106. In preparing for the meeting, Carter did not simply stick to the lowered guidance he had given the market in January 2013. On July 2, 2013, he instead instructed Tesoriero to send him the original analysis that supported the more than $50 million in cost savings that Dole would achieve after the ITOCHU Transaction. The presentation materials that Deutsche Bank circulated in advance of the July 12 Lender Meeting included a discussion of the "timing of realization of total cost savings," which it identified as $50 million. (*Id.* at *20.)

107. As evidence showed, Carter told the meeting attendees that Dole would outperform the July Projections. He said that Dole would "beat or meet forecasts of $155 [million in EBITDA]," and that Dole likely could "upsize the projection by $18-$19 [million]." (*Id.*) The meeting agenda included a discussion of the "timing and realization of total cost savings, originally guided at $50 m[illion] at the time of [the] announcement of [the] ITOCHU transaction." (*Id.*) In addition, notes by a Deutsche Bank attendee state that Carter informed the attendees that Dole had ***already*** achieved "$20 [million] of cost savings" in the $154 million EBITDA for 2013. (*Id.*)

108. Carter also told Murdock's bankers during the July 12 Lender Meeting that Dole would be able to substantially increase its income by buying more farms. The notes of a

Deutsche Bank representative reflect that Dole's farm purchases "[e]asily could [be] $100m" with a "$15m initial return or 20% EBITDA margin." (*Id.*)

109. During the same time period that Carter was secretly preparing accurate projections for Murdock's advisors, the Special Committee and Lazard sought to create their own projections for Dole because they believed that Carter's July Projections were unreliable. Using the December Projections as a starting point, Lazard and the Special Committee made their own adjustments and attempted to reconstruct Dole's normal bottom-up budgeting process using the materials available (the "Committee Projections").

110. Lazard was hampered in its attempts to create accurate projections because it was forced to rely on guidance provided by Dole management in constructing its discounted cash flow ("DCF") analysis for the Committee Projections. A DCF analysis is a valuation method based on assumptions about a company's future operations and results, focusing on free cash flow left over for investors. Investors and financial analysts use DCF analyses to evaluate potential investments.

111. Because Lazard relied on guidance provided by Dole management in conducting its DCF analysis that was then incorporated into the Committee Projections, the Committee Projections were highly flawed and represented an inaccurate picture of the Company due to Defendants' fraud. The Committee Projections failed to include: (i) upward adjustments for achieving the final $30 million of the $50 million in cost savings; and (ii) upward adjustments for the purchases of additional farms.

**7. Announcement Of The Take-Private Transaction**

112. On August 1, 2013, the Special Committee and its advisors met with Murdock and his advisors. At that meeting, the two sides reached an agreement on a price of $13.50 per share. However, during the negotiations regarding the agreement and plan of merger, Carter and

other members of Dole's senior management advised Murdock regarding the transaction and took steps to "conceal their involvement by minimizing their written communications."

113. While the parties negotiated over the terms of the merger agreement, Carter began Dole's annual budget process and instructed Dole's divisions to correct certain unreasonable assumptions made weeks earlier in the July Projections. On August 8, 2013, acting on Carter's instructions, Dole's Controller sent a memorandum to management about creating their forecasts, stating that: (i) all operating divisions except Europe would "easily" exceed 4% EBITDA margins; (ii) the new base case EBITDA projections needed to be "at the **high end** of the EBITDA projections" from the July Projections; (iii) the EBITDA margins therefore "must meet a **minimum 4%** target for 2014, with improvements each year thereafter"; and (iv) the EBITDA forecasts for years four and five in the July Projections should be ignored because the forecasts "need to be reassessed, as these years' projections were kept flat from 2016." (Memorandum Opinion, 2015 WL 5052214, at *23 (emphasis in original).) The new projections were supposed to be more favorable in other areas as well, with annual capital expenditures to be forecasted "at no more than 1.25% of divisional revenues," compared to 1.5% in the July Projections. Tellingly, the Controller's memorandum stated that management's "**budget and 5-year plan submission must reflect these targets**," and that the materials attached to the email for use in preparing the new projections were "**not to be circulated outside of this distribution group**." (*Id.* (emphasis in original).)

114. The Special Committee never learned about the new budget detailed in the Controller's memorandum, though as the Chancery Court observed, "on August 11, 2013, it seemed possible that the Committee might find out." (*Id.*) On that date, the Special Committee was scheduled to vote on Murdock's proposal. However, Alison Ressler, the Sullivan &

Cromwell partner principally advising the Committee, suggested that the Committee delay the vote because she understood that Dole management would be in a position to present updated budget information the next day. When asked about this new budget, as the Chancery Court put it, Carter "lied." (*Id.* at *24.) Carter claimed to "know nothing about a management team meeting" and that "there are no changes to the operating budget." (*Id.*) Murdock immediately called Conrad and left "one of his signature voicemails." (*Id.*) On it, he said he "desperately" needed to talk to Conrad, and that "they are going to postpone the transaction and they will destroy it today if that woman lawyer [referring to Ressler] gets her way. . . . You have the power to tell them you want a vote today." The Special Committee proceeded with the vote that day without the updated budget information. (*Id.*)

115. On August 11, 2013, the members of the Special Committee recommended Murdock's proposal to the entire Board, and the Board approved the transaction. In making such a recommendation, the Special Committee's DCF analyses and other financial information utilized in the Committee Projections were based on incomplete and false information provided by management. As the Chancery Court found, "with the benefit of full information [that emerged during trial] about Dole's value, including its plans for cost savings and farms, the Merger price was not fair. . . . Without information about Dole's cost savings and farm purchases, the $13.50 price was within the range of fairness. With information about Dole's cost savings and farm purchases, the deal fell towards the low end of the range of fairness and may have dropped below it." (*Id.* at *37.)

116. On August 12, 2013, the Board announced that Dole and Murdock had entered into and signed a definitive merger agreement pursuant to which Murdock would acquire for cash all of the outstanding shares of Dole common stock not currently beneficially held by him.

Under the terms of the merger agreement, Dole stockholders would receive $13.50 in cash for each share of Dole common stock that they held, in a transaction that (with the assumption of debt) placed the total enterprise value of Dole at approximately $1.6 billion.

117. Contemporaneous with signing the Merger Agreement, Defendants continued to use forecasts significantly higher than the July Projections. As discussed above, on August 8 2013, Carter had instructed management to create revised forecasts with EBITDA projections at the high end of those set forth in the July Projections. After the Take-Private Transaction was announced, the Company painted a far rosier picture as Murdock sought to finance the Take-Private Transaction. As the Chancery Court found, "[a]fter the Merger Agreement was signed, Dole made presentations to the rating agencies in September 2013 and to its lenders in October 2013 that utilized forecasts similar to the Committee Projections and significantly higher than the July Projections that Carter gave Lazard." (*Id.* at *24.) Those presentations included revenue and EBITDA estimates that substantially outpaced the July Projections. As Lazard's August 11, 2013 presentation to the Special Committee shows, in the July Projections, Dole management projected adjusted EBITDA of $154.5 million for 2013, $164 million for 2014, and $169.2 million for 2015, reaching $183.2 million in 2017. In contrast, Dole's October 2013 presentation to its lenders projected adjusted EBITDA of $166 million for 2013, $189 million for 2014, and $204 million for 2015. Investors were not provided with these improved figures.

**8. Dole's Proxy Statements**

118. In connection with the Take-Private Transaction, Dole released preliminary proxy statements on August 21, September 20, and October 1, 2013, and released its definitive proxy on October 3, 2013 (collectively, the "Proxy Statements"). The purpose of the Proxy Statements was to solicit the votes of Dole's shareholders in favor of the Take-Private Transaction. Each of the Proxy Statements contained materially false and misleading statements, including that:

- Dole had suspended the Stock Repurchase Program as a result of the Ship Acquisitions and significant losses in the strawberry business;

- Murdock sought to take Dole private because "it was unlikely that the stock markets would fully respond to debt reductions and potential improvement in Dole's operations with a sustained higher stock price";

- The July Projections were "based upon a variety of estimates and numerous assumptions believed by Dole's management to be reasonable and based on the best then-currently available information";

- The July Projections "reflect Dole's current business environment and are lower than the Prior 3-Year Plan because of, among other things, lower North American and European banana pricing, higher banana fruit costs, recalibration of expectations for the fresh vegetable business, and the lack of Dole acquisition of farm properties previously anticipated";

- The Special Committee was "delegated exclusive authority to review and evaluate the merger proposal and any other alternatives available to Dole" and was empowered to "solicit . . . other proposals for potential alternatives to Mr. Murdock's proposal as the Special Committee deemed appropriate . . . [and] establish, approve, modify, monitor and direct the process and procedures related to the negotiation"; and

- Defendants, including Murdock and the entities he used to take Dole private, believed that Murdock's take-private offer was "substantively and procedurally fair to Dole's stockholders."

119. As further detailed below, those statements and others in the Proxy Statements were materially false and misleading and omitted material facts because they failed to disclose: (i) the real reasons why Murdock and Carter unilaterally cancelled the Stock Repurchase Program; (ii) Defendants' fraudulent scheme to artificially deflate Dole's stock price so that Murdock could acquire the Company as cheaply as possible; (iii) Carter's intentionally false set of data and assumptions used as a basis for the July Projections; (iv) the accurate set of data and information concerning the Company's performance and prospects provided to Murdock's financial and legal advisors at the Lender Meeting; and (v) Carter's impermissible interference with, and control over, the Special Committee and its purported independence.

#### 9. Shareholders Approve The Take-Private Transaction

120. Dole held a special meeting of stockholders on October 31, 2013, the final day of the Class Period. A narrow majority of 50.9% of the disinterested shares voted in favor of the Take-Private Transaction, 21.2% voted against, 10.5% abstained, and 17.4% did not vote. On October 31, the Company announced that its stockholders approved the merger and that the merger agreement was expected to close on November 1, 2013. The Take-Private Transaction closed at the close of business on November 1, 2013, and at that time Dole's shares of common stock ceased to be traded on the NYSE.

## V. POST-CLASS PERIOD DEVELOPMENTS AND ADMISSIONS

### A. Dole's Performance After The Close Of The Take-Private Transaction

121. Dole's actions and actual results after the Take-Private Transaction closed confirm the fraudulent nature of Defendants' Class Period material misstatements and omissions. For example, after the Take-Private Transaction closed, Dole successfully achieved the more than $50 million in cost savings predicted after the ITOCHU Transaction. Deutsche Bank issued a report on October 14, 2014 stating that "[w]e were encouraged by the $51 million cost savings target that management outlined in our meeting, with roughly $30 million being realized in 2014 and the remainder flowing through 2015." Indeed, Carter testified that Dole ultimately achieved approximately $70 million in cost reductions, with only $5.5 million attributed to Dole no longer operating as a public company. In its report, Deutsche Bank also stated that "Dole significantly beat 2Q14 expectations, delivering $85.9 million of EBITDA for the quarter against our projection of $59.2 million."

122. In addition, after the transaction closed, Dole purchased almost the exact amount of farms that Carter predicted at the July 12, 2013 Lender Meeting, *i.e.*, $100 million worth of farmland that produced an initial return of $15 million. A Wells Fargo analyst report from

December 5, 2014 stated that in 2014, Dole spent "$37 million for the acquisition of a pineapple farm and $7 million for the acquisition of a banana farm . . . . In addition, Dole has purchased several farms throughout the year, which require payments in FQ4 exceeding $80 million. A Deutsche Bank report stated that the farms were expected to increase EBITDA by "around $23 million once the acquisitions are fully integrated." These analyst statements were confirmed by Carter in the Chancery Court Trial when he testified that Dole purchased a total of "maybe $80, $100 million worth of farms" in 2014.

123. As the Chancery Court found, despite Defendants' arguments to the contrary, those farm purchases "all were consistent with Dole's long-term strategy of buying farms." (Memorandum Opinion, 2015 WL 5052214, at *25.) Indeed, a Dole presentation from 2013 listed a number of farms the Company was looking to purchase, which it did in fact purchase after the Take-Private Transaction closed.

124. The Chancery Court, after considering extensive evidence and expert analysis, concluded that "[a]dding the full value of the incremental cost savings and farm purchases ($6.84 per share) increases the range of fair value implied by Lazard's DCF to $18.24 to $20.92." (*Id.* at *36.)

**B. Defendants Maintain Through May 2015 That They Did Not Commit Fraud**

125. Following the announcement of Murdock's proposed takeover, shareholders filed lawsuits against Defendants in the Chancery Court alleging breaches of fiduciary duty in connection with Murdock's Take-Private Transaction and statutory appraisal proceedings in connection with the fairness of the deal. *See In re Dole Food Co. Inc. Stockholder Litigation*, Consolidated C.A. No. 8703-VCL and *In re Appraisal of Dole Food Company, Inc*. Consolidated C.A. No. 9079-VCL. The consolidated Chancery Court Action was heavily litigated for more

than two years, leading to a trial that took place over nine days between February 23, 2015 and March 9, 2015, with the parties introducing over 1800 exhibits, the testimony of ten fact witnesses and three experts, twenty-nine depositions, and pre- and post-trial briefs that collectively were over 600 pages long. Aside from certain otherwise publicly available exhibits such as reports by securities analysts, the documentary and testimonial evidence in the Chancery Court Action was confidential and nonpublic until the Chancery Court Trial. Indeed, even after trial and the issuance of the Memorandum Opinion, a substantial majority of the exhibits introduced at trial (and not under seal) were available only through the Register in Chancery.

126. Throughout the course of the Chancery Court Action, Defendants Murdock and Carter consistently denied that they issued materially false and misleading statements, or omitted material facts, to artificially depress Dole's share price. For example, in their briefs in support of their motions for summary judgment, filed on October 24, 2014, Defendants Murdock and Carter maintained that "it is undisputed that there was nothing inaccurate about Dole's public statements," and that "[t]he earnings guidance simply reflected Dole's economic reality following stockholder approval of the ITOCHU Transaction . . . leaving behind principally low-margin, highly volatile, unpredictable commodity produce businesses." Similarly, Murdock and Carter denied the pretextual nature of Dole's Ship Acquisitions in connection with the cancellation of the Stock Repurchase Program, arguing that "[t]here is no evidence that the purchase of the ships was anything other than a rational exercise of the Board's business judgment."

**C. The Delaware Chancery Court Finds That Defendants Committed Fraud**

127. Despite Defendants' counsel's strenuous arguments, the Chancery Court, on August 27, 2015, found that Defendants Murdock and Carter had breached their fiduciary duty of loyalty to Dole's shareholders and held them jointly and severally liable for damages of $148.19

million. Specifically, Vice Chancellor Laster found that "[b]efore Murdock made his proposal, ***Carter made false disclosures about the savings Dole could realize after selling approximately half of its business in 2012***." (Memorandum Opinion, 2015 WL 5052214, at *2.) Vice Chancellor Laster found Murdock and Carter's conduct to be "***intentional and in bad faith***," and that "***Carter engaged in fraud***." (*Id.*)

128. In connection with Murdock and Carter's liability, the Chancery Court made the additional findings supporting Lead Plaintiffs' allegations that: (i) Defendants' scheme to take Dole private was memorialized in the pre-Class Period Tesoriero Memo that functioned as a step-by-step playbook for effectuating the Take-Private Transaction (*see id.* at *6); (ii) Defendants' statements concerning "cost savings" were false (*see id.* at *11, 27); (iii) based on Dole's financial advisor's estimates and its own internal reports, Defendants knew that their cost-saving statements were false (*see id.*); (iv) Defendants' statements concerning the reasons for cancelling the Stock Repurchase Program were pretextual and false (*see id.* at *2, 14); (v) as Defendant Carter himself admitted, Defendants' statements concerning the cancellation of the Stock Repurchase Program were issued for the purpose of further driving down the price of Dole's common stock (*see id.* at *14); and (vi) Defendants knew that Carter prepared and presented to the Board false and misleading five-year July Projections but failed to disclose in any of Dole's Proxy Statements or other publicly disseminated statements that Carter provided Murdock's advisors with the true and accurate financial data of the Company (*see id.* at *18-21).

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

129. The Class Period begins on January 2, 2013, when, in connection with the ITOCHU Transaction, Defendants began making materially false and misleading statements, and omitting material facts, to artificially depress the value of Dole's common stock concerning,

among other things: (i) the Company's 2013 earnings guidance; (ii) the cost savings that could be achieved through the consummation of the ITOCHU Transaction; (iii) the true value of Dole's key real-estate assets; (iv) the cancellation of the Company's Stock Repurchase Program; (v) Carter's interference with the Special Committee's independence; (vi) the egregiously false July Projections Carter provided to the Special Committee and Lazard; and (vii) Carter's secret July 12, 2013 Lender Meeting with Murdock's advisors where Carter provided the true and accurate projections and financial data for Dole.

130. Defendants made the following materially false and misleading statements and omissions during the Class Period.

**A. Dole's January 2, 2013 Press Release**

131. On January 2, 2013, in connection with the announcement of the ITOCHU Transaction, and for the first time since its 2009 IPO, Dole issued a press release (the "January 2, 2013 Press Release") containing quantitative analysis – analysis that was overwhelmingly negative and materially false and misleading. Specifically, Defendant Carter stated in the January 2, 2013 Press Release that:

> [O]ur current expectation is that pro forma ***2013 Adjusted EBITDA for the new Dole, including 2013 planned cost savings in the $20 million range, will be in the $150 - $170 million range***, with income from continuing operations, net of income taxes, in the $45 - $60 million range, assuming no major market changes.

132. This statement was false. As the Chancery Court determined, "Carter's reduced estimate was false," and "Carter was not a credible witness on this issue, and he did not provide a believable explanation for the reduced figure." (Memorandum Opinion, 2015 WL 5052214, at *27.) Moreover, this statement was materially false and misleading because Carter failed to disclose the truth that the Company would receive significantly greater cost savings as a result of the ITOCHU Transaction, that its 2013 earnings guidance was actually significantly higher than

represented, and that the value of its key real estate assets was in fact worth hundreds of millions of dollars more than represented. Specifically, these statements were materially false and misleading and omitted material facts because, as the Court of Chancery found:

(i) in its fairness opinion to the Board in connection with the ITOCHU Transaction, Deutsche Bank advised Dole that it would achieve $50 million, not $20 million, in cost savings, a number that Deutsche Bank viewed as conservative (*see id* at *11);

(ii) DeLorenzo, Dole's President and CEO prior to Carter's replacing him after the ITOCHU Transaction, provided the same $50 million figure in a presentation to analysts, specifically explaining that the $50 million would be achieved by the end of 2013, expectations that were reiterated in November 2012 and again in December 2012 in a presentation to Dole's Board (*see id.*);

(iii) in January 2013, Deloitte & Touche sent Carter an analysis identifying savings of $55 to $90 million per year (*see id.*); and

(iv) Dole's own internal plan identified $62 million in cost savings (*see id.*).

133. In the same January 2, 2013 Press Release, Defendants also falsely explained the motivation for providing their lowered, albeit materially false and misleading, guidance, with the Company stating that "***Dole has provided earnings guidance to give investors general information on the overall direction of its remaining businesses following the sale transaction***."

134. This statement was false. Dole did not provide this guidance to give investors general information on the overall direction of its remaining businesses following the ITOCHU Transaction. Rather, as the Chancery Court found, Defendants provided quantitative earnings guidance, which was highly unusual for Dole, to intentionally and artificially depress the value of Dole's common stock in preparation for Murdock's Take-Private Transaction, which Murdock had been planning since 2012, as demonstrated by the Tesoriero Memo, Murdock's regular discussions with Deutsche Bank, and his preparatory sale of his own assets, including the island of Lanai.

**B. Dole's January 24, 2013 Press Release And January 25, 2013 Form 8-K**

135. Three weeks later, on January 24, 2013, Dole issued another press release (the "January 24, 2013 Press Release"), once again uncharacteristically containing quantitative guidance – guidance that again was overly pessimistic, and materially false and misleading, concerning the Company's 2013 Adjusted EBITDA. Specifically, Defendant Carter stated that "***we expect 2013 Adjusted EBITDA for the new Dole to be at the low end of the guidance range we announced on January 2, 2013***, assuming no major market changes."

136. Like the January 2, 2013 Press Release, the January 24, 2013 Press Release falsely explained Dole's motivation for providing its lowered, false guidance, with the Company stating, "***Dole has provided earnings guidance to give investors general information on the overall direction of its remaining businesses following the sale transaction***."

137. These statements were materially false and misleading because they failed to disclose the truth that the Company would receive significantly greater cost savings as a result of the ITOCHU Transaction, that its 2013 earnings guidance was actually significantly higher than represented, and that the value of its key real-estate assets was in fact worth hundreds of millions of dollars more than represented. Specifically, these statements were materially false and misleading and omitted material facts because, as the Chancery Court found:

(i) in its fairness opinion to the Board in connection with the ITOCHU Transaction, Deutsche Bank advised Dole that it would achieve \$50 million, not \$20 million, in cost savings, a number that Deutsche Bank viewed as conservative (Memorandum Opinion, 2015 WL 5052214, at *11);

(ii) DeLorenzo, Dole's President and CEO prior to Carter's replacing him after the ITOCHU Transaction, provided the same \$50 million figure in a presentation to analysts, specifically explaining that the \$50 million would be achieved by the end of 2013, expectations which were reiterated in November 2012 and again in December 2012 in a presentation to Dole's Board (*see id.*);

(iii) in January 2013, Deloitte & Touche sent Carter an analysis identifying savings of \$55 to \$90 million per year (*see id.*); and

(iv) Dole's own internal plan identified $62 million in cost savings (*see id.*).

138. Moreover, Dole did not provide this guidance to give investors general information on the overall direction of its remaining businesses following the ITOCHU Transaction. Rather, as the Chancery Court found, Defendants intentionally artificially depressed the value of Dole's common stock in preparation for Murdock's Take-Private Transaction, which Murdock had been planning since 2012, as demonstrated by the Tesoriero Memo, Murdock's regular discussions with Deutsche Bank, and his preparatory sale of his own assets, including the island of Lanai.

139. In the same January 24, 2013 Press Release, Defendants also made materially false and misleading statements concerning the valuation of the Hawaiian Land. Specifically, Defendant Carter stated that "Dole currently estimates the relatively short-term monetization of the approximately 21,800 acres of land that Dole is not currently farming, ***to be in the $175 million to $200 million range***."

140. These statements by Carter were materially false and misleading and omitted material facts because just four months prior, on September 17, 2012, Dole publicly issued a presentation describing the Hawaiian Land as "over $500 million [fair market value] of non-core assets (e.g. idle land)," *i.e.*, far in excess of the $175 million to $200 million that Carter represented the Hawaiian Land to be worth on January 24, 2013. There was no reasonable basis for the Company's significantly depreciated valuation of this land.

141. Analysts immediately questioned why the value of Dole's unused Oahu land had decreased so dramatically. On January 25, 2013, BB&T reported that the discount to Dole's own previous estimated value "strikes us as very large," and stated that "[w]e wonder how it could ever be considered in shareholders' interest to pursue a highly-discounted sale of the Hawaiian land."

142. The following day, after the close of trading on January 25, 2013, the Company issued and filed with the SEC a Form 8-K and accompanying press release (the "January 25, 2013 Form 8-K"). The January 25, 2013 Form 8-K was signed by Joseph S. Tesoriero, Dole's then-Executive Vice President and Chief Financial Officer, and the press release repeated the same materially false and misleading statements contained in the January 24, 2013 Press Release referenced above.

**C. Dole's February 22, 2013 Press Release And February 25, 2013 Form 8-K**

143. On February 22, 2013, in connection with ITOCHU's paying Dole a non-refundable cash deposit of $200 million in the ITOCHU Transaction, Dole issued yet another press release (the "February 22, 2013 Press Release") containing materially false and misleading statements concerning the Company's 2013 guidance and cost savings. Specifically, the Company stated:

> Fresh fruit performance is continuing its declining trend, principally due to banana market conditions, and Dole expects that 2013 Adjusted EBITDA for these businesses will be at the low end of the previously announced guidance range of $150 - $170 million, with income from continuing operations, net of income taxes, in the $45 - $60 million range, assuming no major market changes.

144. Moreover, in the same February 22, 2013 Press Release, Defendants also falsely described the motivation for providing their lowered, false guidance, with the Company stating that "***Dole has provided earnings guidance to give investors general information on the overall direction of its remaining businesses following the [ITOCHU] sale transaction***."

145. As referenced above, these statements were materially false and misleading for the same reasons alleged herein in Paragraphs 132 and 134. In reality, Dole expected cost savings of $50 million, not $20 million, and Dole was providing the depressed earnings guidance to drive down the price of Dole stock to enable Murdock to acquire the Company more cheaply.

146. The February 22, 2013 Press Release also contained materially false and misleading statements concerning Dole's lowered valuation of its Hawaiian Land assets previously referenced in the January 24, 2013 Press Release, with the Company stating in regard to proceeds from selling these assets, recently valued at approximately $500 million, that "***[T]argeted proceeds are in the $175 – $200 million range, which would exceed current book value***."

147. These statements were false for the same reason as above at Paragraph 140. In sum, just four months prior, Dole told investors that the Hawaiian Land was worth over $500 million, far in excess of $175-$200 million, and there was no reasonable basis for the Company's significantly depreciated valuation of this land.

148. On February 25, 2013, Dole issued and filed with the SEC a Form 8-K that attached the February 22, 2013 Press Release (the "February 25, 2013 Form 8-K"). The February 25, 2013 Form 8-K was signed by Defendant Carter as President and Chief Operating Officer of Dole. The February 25, 2013 Form 8-K contained the same materially false and misleading statements as the February 22, 2013 Press Release noted above.

**D. Dole's March 12, 2013 Announcement Of Fourth Quarter And Year-End 2012 Financial Results**

149. On March 12, 2013, just before the close of trading, the Company held an earnings conference call with investors to discuss the Company's fourth quarter and year ended December 29, 2012 financial results (the "March 12, 2013 Earnings Conference Call"). Also on March 12, 2013, after the close of trading, the Company issued and filed with the SEC its Form 10-K for fiscal year ended December 29, 2012, which was signed by Defendant Carter (the "2012 Form 10-K"). As they had done throughout the Class Period, Defendants continued to provide overwhelmingly negative and false information concerning the Company's 2013

guidance, with Defendant Carter stating during the March 12, 2013 Earnings Conference Call that market conditions "***led us to the lower end of our previous guidance of $150 million to $170 million*** assuming no major market changes. This guidance includes ***expected sustainable cost savings of $20 million***, $10 million of which will be contributed by corporate and the remaining $10 million from operations."

150. In addition, in response to a BB&T analyst's question whether Carter anticipated "the remaining $30 million" in cost savings in 2014 on top of the $20 million projected for 2013, Carter falsely stated, "No. . . [T]hese programs remain in still a developmental stage at the moment and so it's still too early to talk about the timing of the costs and the savings from them. . . . [T]he best I can do right now is you could certainly count on this $20 million continuing."

151. These statements were false for the same reasons set forth above in Paragraph 132. Both prior to and after the ITOCHU Transaction, Dole and its advisors all projected at least $50 million annually in cost savings as a result of the ITOCHU Transaction, and there was no reasonable basis to believe that cost savings would be as low as $20 million annually. In addition, Dole planned to purchase additional farms, which would increase earnings beyond the guidance that Defendants provided.

152. During the March 12, 2013 Earnings Conference Call, Defendants once again falsely undervalued the Hawaiian Land, with Defendant Carter stating that:

> [W]e have assessed our capital structure needs together with other possible internal funding resources including Dole's Hawaii landholdings on the island of Oahu where we are actively marketing the approximately 20,600 acres of land that Dole is not currently farming. We're seeking to sell as much of this land as we possibly can each year, expecting that it will take a few years to sell such a large quantity of farmland. ***Targeted proceeds are in the $175 million to $200 million range***.

153. Similarly, in the 2012 Form 10-K, the Company reiterated its artificially low and false valuation of these assets, stating that:

> [W]e are actively marketing the approximately 20,600 acres of land that we are not currently farming in Hawaii on the Island of Oahu. We are seeking to sell as much of this land as we possibly can each year, expecting that it will take a few years to sell such a large quantity of farm and other land holdings. ***Targeted proceeds are in the $175 – $200 million range, which would exceed current book value***.

154. These statements concerning the value of the Hawaiian Land were materially false and misleading for the same reasons alleged herein in Paragraph 140. In sum, just four months prior, Dole told investors that the Hawaiian Land was worth over $500 million, far in excess of $175-$200 million, and there was no reasonable basis for the Company's significantly depreciated valuation of this land.

**E. Dole's May 2, 2013 Announcement Of First-Quarter 2013 Financial Results**

155. On May 2, 2013, after the close of trading, Dole issued and filed with the SEC a Form 8-K and accompanying press release (the "May 2, 2013 Form 8-K"). The May 2, 2013 Form 8-K was signed by Keith C. Mitchell, Dole's then-Vice President and Chief Financial Officer, and the press release contained materially false and misleading information concerning the Company's 2013 guidance. Specifically, in this press release, Defendant Carter stated, "***Dole's first quarter performance is in line with our full-year expectations for 2013, at the low end of the guidance range of $150–$170 million***."

156. Defendant Carter also stated in the May 2, 2013 Form 8-K and accompanying press release, "[W]e expect second quarter Adjusted EBITDA to approximate half of first quarter Adjusted EBITDA . . . with lower earnings from both our fresh fruit and fresh vegetables businesses."

157. Moreover, in the same May 2, 2013 Form 8-K and accompanying press release, Defendants also falsely explained Dole's motivation for providing its lowered, false guidance, with the Company stating that "***Dole has provided earnings guidance to give investors general***

***information on the overall direction of its remaining businesses following the sale transaction***."

158. Also, on May 2, 2013, the Company held a conference call with financial analysts to discuss the Company's first quarter 2013 financial results (the "May 2, 2013 Earnings Conference Call"), during which Defendants made materially false and misleading statements concerning Dole's 2013 guidance. In the May 2, 2013 Earnings Conference Call, Defendant Carter falsely stated, "***Dole's first quarter performance is in line with our full-year expectations for 2013, at the low end of the guidance range of $150 million to $170 million***."

159. As referenced above, these statements concerning Dole's earnings guidance were materially false and misleading for the same reasons alleged herein in Paragraph 132. Both prior to and after the ITOCHU Transaction, Dole and its advisors all projected at least $50 million annually in cost savings as a result of the ITOCHU Transaction, and there was no reasonable basis to believe that cost savings would be as low as $20 million annually. In addition, Dole planned to purchase additional farms, which would increase earnings beyond the guidance that Defendants provided.

### F. Dole's May 28, 2013 Form 8-K

160. On May 28, 2013, during the trading day, the Company issued and filed with the SEC a Form 8-K and accompanying press release (the "May 28, 2013 Form 8-K"). The May 28, 2013 Form 8-K was signed by Defendant Carter, and it contained materially false and misleading statements concerning the Company's Stock Repurchase Program. Specifically, the Company stated, "Dole . . . announced the indefinite suspension of the previously announced share repurchase program for up to $200M of its outstanding common stock." The May 28, 2013 Form 8-K quoted Carter as saying:

> [W]e have decided to use our existing funding resources to take advantage of this opportune window in the shipping industry . . . . With the approximate $165 million investment in the ships and the drag on earnings due to significant losses in our strawberry business, the share repurchase program is being suspended indefinitely.

161. These statements were materially false and misleading because they were completely "pretextual," as the Chancery Court concluded. (Memorandum Opinion, 2015 WL 5052214, at *14.) Specifically, Defendant Carter claimed that Dole could not pursue both the Stock Repurchase Program and the Ship Acquisitions because of covenants in Dole's debt, which were at risk if Dole immediately spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for acquiring new ships. As the Chancery Court found, that claim was false. (*Id.* at *28.) Dole was not obligated to spend the full $200 million on shares, and the program was authorized to be carried out over a year. The contract for the ships called for payments spread over four years, with $32.9 million per year due in 2013 and 2014. The Board believed that the Ship Acquisitions and Stock Repurchase Program were both feasible. So did BAML, which was hired by Dole to advise on the share repurchase. Defendant Carter even conceded that the debt covenants would not have been tripped by pursuing both initiatives, even if the ships had been paid in full and all $200 million of share repurchases were completed in May 2013. In addition, as the Chancery Court found, Carter also indefinitely suspended the Stock Repurchase Program to "spite the outside directors and teach them a lesson about who was really in charge," and, as Carter admitted, he issued these statements because he knew that they would drive down the price of Dole stock. (*Id.* at *28 n.15.)

**G. Murdock's June 10, 2013 Letter Announcing His Take-Private Offer**

162. On June 10, 2013, Murdock wrote a letter to the Dole Board, which was attached to a Form 13D and filed with the SEC that same day, extending his $12.00 per share offer for the outstanding shares of Dole common stock that he did not already own or control. In that letter,

Murdock wrote that "the Company has focused on enhancing shareholder value through such measures as the sale of the Company's Asia fresh produce business and global packaged food business, restructurings and improvements to existing businesses, cost reductions, and investments in additional businesses," but ***"[t]hese initiatives have had little impact on the Company's stock price***, which has declined 21% since September 11, 2012, the day prior to published reports of the Company's transaction with ITOCHU."

163. These statements by Murdock were materially false and misleading for the reasons discussed in Paragraph 132. As Murdock knew, the ITOCHU Transaction had produced, and would continue to produce, cost savings in line with the Company's initial $50 million projection. Moreover, Murdock omitted to inform investors that both disclosing the actual cost savings from the ITOCHU Transaction, and implementing the Stock Repurchase Program, would have boosted Dole's share price significantly. Murdock also did not inform investors that Dole had cancelled the Stock Repurchase Program precisely because it would have caused the share price to increase, necessitating more consideration for Murdock to freeze out his public investors. Murdock's statement was also materially false and misleading for the additional reason that – as he knew – rather than declining due to failed initiatives, Dole's stock price declined through 2013 as a direct result of Defendants' representation that the Company would realize only $20 million in cost savings after the ITOCHU Transaction, as well as the decision to cancel the Repurchase Program.

### H. Dole's July 25, 2013 Announcement Of Second Quarter 2013 Financial Results

164. On July 25, 2013, after the close of trading, the Company issued and filed with the SEC a Form 8-K, which was signed by Vice President and CFO Keith C. Mitchell, and an accompanying press release announcing the Company's financial results for the second quarter

2013 (the "July 25, 2013 Form 8-K"). That same day, Dole issued and filed with the SEC a Form 10-Q with the Company's results for the second quarter of 2013 (the "Second Quarter 2013 Form 10-Q").

165. The July 25, 2013 Form 8-K falsely confirmed that Dole's full-year guidance was at "***the low end of the $150 - $170 million range***, assuming no major market changes."

166. Moreover, Defendants falsely explained the motivation for the false and misleading guidance, with the Company stating, "***Dole has provided earnings guidance to give investors general information on the overall direction of its business***."

167. As referenced above, these statements were materially false and misleading for the same reasons alleged herein in Paragraphs 132 and 134. Both prior to and after the ITOCHU Transaction, Dole and its advisors all projected at least $50 million annually in cost savings as a result of the ITOCHU Transaction, and there was no reasonable basis to believe that cost savings would be as low as $20 million annually. In addition, Dole planned to purchase additional farmland, which would increase earnings beyond the guidance that Defendants provided. Further, Dole did not provide this guidance to give investors general information on the overall direction of its remaining business. Rather, as the Chancery Court found, Defendants provided quantitative earnings guidance, which was highly unusual for Dole, to intentionally and artificially depress the value of Dole's common stock in preparation for Murdock's Take-Private Transaction.

168. The Second Quarter 2013 Form 10-Q repeated Defendants' material misstatements regarding the cancellation of the Stock Repurchase Program, stating: "[d]uring the quarter, Dole announced that its Board of Directors has approved updating Dole's owned vessel fleet, with the acquisition of three new specialty built refrigerated container ships for its

U.S. West Coast operations, and that the share repurchase program is being suspended indefinitely."

169. These statements concerning the cancellation of the Stock Repurchase Program were materially false and misleading and omitted material facts because they were completely "pretextual," as the Chancery Court concluded. (Memorandum Opinion, 2015 WL 5052214, at *14.) Specifically, Defendant Carter claimed that Dole could not pursue both the Stock Repurchase Program and the Ship Acquisitions because of covenants in Dole's debt, which were at risk if Dole immediately spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for acquiring new ships. As the Chancery Court found, that claim was false. (*Id.* at *28.) Dole was not obligated to spend the full $200 million on shares, and the program was authorized to be carried out over a year. The contract for the ships called for payments spread over four years, with $32.9 million per year due in 2013 and 2014. The Board believed that the Ship Acquisitions and Stock Repurchase Program were both feasible. So did BAML, which was hired by Dole to advise on the share repurchase. Defendant Carter conceded in the Chancery Court Trial that the debt covenants would not have been tripped by pursuing both initiatives, even if the ships had been paid in full and all $200 million of share repurchases were completed in May 2013. Strikingly, as the Chancery Court found, Carter also indefinitely suspended the Stock Repurchase Program to "spite the outside directors and teach them a lesson about who was really in charge," and, as Carter admitted, he issued these statements because he knew that they would drive down the price of Dole stock. (*Id.* at *28 n.15.)

170. In addition, the Second Quarter 2013 Form 10-Q repeated Defendants' materially false and misleading statements about Dole's financial results for its second quarter, stating:

> The decline in operating income is primarily attributable to higher ITOCHU transaction related costs and lower fresh fruit and fresh vegetables operating

> results. Fresh fruit operating income decreased due to higher fruit costs of Latin sourced bananas and lower banana pricing in North America. Fresh vegetables operating income decreased due to lower pricing of strawberries and blueberries and higher growing costs for strawberries."

171. The above statements were materially false and misleading and omitted material facts because the decline in operating income was not primarily attributable to higher ITOCHU Transaction-related costs. Instead, the represented results and guidance were false for the reasons set forth above at Paragraph 132. Both prior to and after the ITOCHU Transaction, Dole and its advisors all projected at least $50 million annually in cost savings as a result of the ITOCHU Transaction, and there was no reasonable basis to believe that cost savings would be as low as $20 million annually. In addition, Dole planned to purchase additional farms, which would increase earnings beyond the guidance that Defendants provided.

172. On July 25, 2013, Dole held an earnings conference call with investors to discuss the Company's second quarter financial results (the "July 25, 2013 Earnings Conference Call"). During the July 25, 2013 Earnings Conference Call, Defendants continued to provide negative and false information concerning the Company's 2013 guidance, with Defendant Carter stating "[a]ssuming no major market changes, ***we still expect full-year adjusted EBITDA to be at the low end of the $150 million to $170 million range***. This is due to the continued declining trend in Fresh Fruit performance, particularly due to banana market conditions and the full-year losses on our strawberry business." Later in the call, in response to a question from a BB&T analyst specifically about cost savings following the ITOCHU Transaction, Carter falsely stated that, "at this point, there's nothing further to say regarding cost savings, other than what we are already doing."

173. The statements made regarding Dole's EBITDA during the July 25, 2013 Earnings Conference Call were materially false and misleading and omitted material facts

because, as the Chancery Court found, Defendants failed to disclose at the time this statement was made that: (i) Deutsche Bank advised Dole that it would achieve $50 million, not $20 million, in costs saving, a number which Deutsche Bank viewed as conservative (Memorandum Opinion, 2015 WL 5052214, at *11); (ii) DeLorenzo, Dole's President and CEO prior to the ITOCHU Transaction, provided the same $50 million figure in a presentation to analysts, specifically explaining that the $50 million in costs saving would be achieved by the end of 2013 (*id.*); (iii) Dole's own internal plan identified $62 million in costs savings (*id.*); and (iv) Deloitte & Touche sent Defendant Carter an analysis identifying savings of $55-90 million per year (*id.*).

174. Moreover, these above statements were also materially false and misleading and omitted material facts because, unbeknownst to investors, including Plaintiffs, Dole did not provide this guidance to give investors general information on the overall direction of its remaining businesses following the ITOCHU Transaction, but rather, as the Chancery Court found, to artificially depress the value of Dole's common stock in preparation for Murdock's Take-Private Transaction, which had been in the works since 2012, as demonstrated by the Tesoriero Memo, Murdock's frequent communications with Deutsche Bank, and his preparatory sale of his own assets, including the island of Lanai for $300 million.

175. Defendants' statements in the July 25, 2013 Earnings Conference Call were also materially false and misleading and omitted material facts in light of the statements Carter made at the July 12, 2013 Lender Meeting. The Chancery Court found that in preparing for the July 12, 2013 meeting, Carter "instructed Tesoriero to send him the original analysis that supported '***well over $50 [million in cost savings]***' on July 2." (*Id.* at *20.) The Chancery Court also found that during the Lender Meeting, Carter stated Dole would be able to "***substantially increase its income*** by buying more farms." (*Id.*) In addition, the notes of a Deutsche Bank

representative who attended the meeting also reflect the falsity of Defendants' statements. Those notes show that Carter stated that Dole "***already had achieved '$20 [million] of cost savings' in the $154 million EBITDA for 2013***" and that Dole's farm purchases "***[e]asily could be $100 [million] ($15 [million] initial return or 20% EBITDA margin).***" (*Id.*) Thus, by July 12, 2013, Defendants had already achieved enough cost savings to beat "the low end of the $150 -$170 million range" and expected significantly more savings and income in the remainder of the fiscal year which would further boost Dole's EBITDA for 2013.

176. In addition, during the July 25, 2013 Earnings Conference Call, Keith L. Mitchell, Dole's Chief Financial Officer, stated "we're actively marketing Hawaii land in the $175 million, $200 million range." This above statement was materially false and misleading and omitted material facts because Defendants failed to disclose at the time this statement was made that the Hawaiian Land that Dole sought to sell had been estimated to be worth approximately $500 million, far exceeding the range of $175 million to $200 million that the Company purportedly assessed it to be worth, and there was no material change or other basis for Dole's significantly depreciated valuation of the Hawaiian Land.

**I. Dole's Proxy Statements**

177. On August 21, 2013, Dole issued and filed with the SEC its first preliminary Proxy Statement on Schedule 14A (the "August 21, 2013 Preliminary Proxy Statement"), which Defendant Carter signed. The purpose of the August 21, 2013 Preliminary Proxy Statement was to solicit shareholder votes approving the Take-Private Transaction. In seeking such shareholder action, Defendants disseminated materially false and misleading statements and omissions of fact in the August 21, 2013 Preliminary Proxy Statement.

178. Moreover, Defendants disseminated identical or substantially identical materially false and misleading statements and omissions of material fact contained in the August 21, 2013

Preliminary Proxy Statement in the following subsequent Proxy Statements that the Company filed with the SEC on Schedules 14A: (i) a September 20, 2013 Preliminary Proxy Statement; (ii) an October 1, 2013 Preliminary Proxy Statement; and (iiii) the October 3, 2013 Definitive Proxy Statement, all of which Defendant Carter signed.

### 1. Misstatements And Omissions Concerning The Procedural Fairness Of The Transaction

179. In the August 21, 2013 Preliminary Proxy Statement, Defendants set forth details of the purported robust and fair process undertaken to evaluate whether the Take-Private Transaction was, in fact, in the best interest of Dole's shareholders. For example, in response to the question, "What did the Board do to make sure that the Merger Consideration is fair," Defendants stated that the "Board formed the Special Committee . . . who were delegated exclusive authority to review and evaluate the merger proposal ***and any other alternatives available to Dole***." Similarly, the August 21, 2013 Preliminary Proxy Statement stated that the Special Committee was empowered to "solicit . . . other proposals for potential alternatives to Mr. Murdock's proposal as the Special Committee deemed appropriate . . . [and] establish, approve, modify, monitor and direct the process and procedures related to the negotiation."

180. These above statements were materially false and misleading and omitted material facts because, as the Chancery Court found, Defendant Carter intentionally limited the scope of the Special Committee's authority to consider "alternatives" to Murdock's proposal, specifically informing the Special Committee that the "Dole Board created the Special Committee . . . specifically to deal with Murdock's proposal and for no other purpose." (Memorandum Opinion, 2015 WL 5052214, at *16.) Conrad further recalled that Carter "'hammered on' these issues" and ultimately the Special Committee "decided not to force the issue." (*Id.*) Moreover, far from monitoring the procedures relating to the negotiations with Murdock, Carter met with Murdock's

advisors on July 12, 2013 in clear violation of the procedures that the Special Committee had established, as Murdock and his advisors were supposed to communicate with the Special Committee only when interacting with Dole on matters relating to Murdock's proposal.

181. The August 21, 2013 Preliminary Proxy Statement also disclosed the "Position of the Purchaser Parties" as to the fairness of Murdock's offer to Dole stockholders. The "Purchaser Parties" included Defendant Murdock and the two entities he formed to effectuate the Take-Private Transaction. The August 21, 2013 Preliminary Proxy Statement stated that "***each of the Purchaser Parties . . . believes that the merger is substantively and procedurally fair***," and stated that the "price of $13.50 per share . . . represents a premium of approximately 32.4% over the reported closing price for the shares on June 10, 2013, the last full day prior to the public announcement of Mr. Murdock's initial proposal." Similarly, in response to a question posed in the August 21, 2013 Preliminary Proxy Statement concerning "What do the Purchaser Parties think of the merger," Defendants stated that the "***Purchaser Parties believe that the merger is substantively and procedurally fair to Dole's stockholders***."

182. These above statements were materially false and misleading and omitted material facts because, as the Chancery Court found, Defendants Murdock and Carter acted "***intentional[ly] and in bad faith***" and Carter "***engaged in fraud***" in deceiving the investing public about the Company's operations and finances to artificially depress the price of Dole's stock during the Class Period so that Defendant Murdock could buy the Company on the cheap. (Memorandum Opinion, 2015 WL 5052214, at *2.) As the Chancery Court found, Defendants Murdock's and Carter's wrongdoing rendered the Take-Private Transaction both substantively and procedurally unfair to Dole's stockholders. Moreover, the purported premium of "32.4%" was materially misleading because Dole's stock price was artificially deflated during the Class

Period by Defendants' wrongdoing as detailed herein, which skewed the premium percentage afforded to Dole stockholders.

### 2. Misstatements And Omissions Concerning The Cancellation Of The Stock Repurchase Program

183. The August 21, 2013 Preliminary Proxy Statement also contained material misstatements and omissions concerning the purported reason why Defendants canceled Dole's Stock Repurchase Program. For example, in the "Background of the Merger and Special Committee Proceedings" section of the Proxy Statement, Dole falsely stated that "[a]s a result of the ship acquisitions and significant losses in the strawberry business," Dole suspended its Stock Repurchase Program.

184. The above statement was materially false and misleading and omitted material facts because, as the Chancery Court found, the new Ship Acquisitions in no way precluded the announced Stock Repurchase Program. (Memorandum Opinion, 2015 WL 5052214, at *13-14.) Specifically, Defendant Carter claimed that Dole could not pursue both the Stock Repurchase Program and the Ship Acquisitions because of covenants in Dole's debt, which were at risk if Dole immediately spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for acquiring new ships. As the Chancery Court found, that claim was false. (*Id.* at *28.) Dole was not obligated to spend the full $200 million on shares, and the program was authorized to be carried out over a year. (*Id.*) Moreover, the contract for the ships called for payments to be spread over four years, with $32.9 million due in each of 2013 and 2014. The Board as well as BAML believed that the planned Ship Acquisitions and Stock Repurchase Program were both feasible, and Defendant Carter admitted in the Chancery Court Trial that the debt covenants would not have been tripped by pursuing both initiatives, even if the ships had been paid in full and all $200 million of share repurchases were completed in May 2013. (*Id.*

at *14.) As the Chancery Court found, Carter also indefinitely suspended the Stock Repurchase Program to "spite the outside directors and teach them a lesson about who was really in charge," and, as Carter admitted, he issued these statements because he knew that they would drive down the price of Dole stock. (*Id.* at *28 n.15.)

### 3. Misstatements And Omissions Concerning Management's Projections

185. The August 21, 2013 Preliminary Proxy Statement also contained a section entitled "Management Projections" in which the Company stated that the July Projections – which were constructed by Defendant Carter, and intentionally used falsely depressed numbers and data – "are based upon a variety of estimates and numerous assumptions ***believed by Dole's management to be reasonable and based on the best then-currently available information*** with respect to, among other matters, industry performance, general business, economic, market and financial conditions, weather-related phenomena, market responses to industry volume pressures, product and raw material supplies and pricing, changes in interest and currency exchange rates, economic crises, quotas, tariffs and other governmental actions and international conflict and other matters."

186. Moreover, the August 21, 2013 Preliminary Proxy Statement stated that these "projections . . . reflect Dole's current business environment and are lower than the Prior 3-Year Plan [*i.e.*, the December Projections] because of, among other things, lower North American and European banana pricing, higher banana fruit costs, recalibration of expectations for the fresh vegetable business, and the lack of Dole acquisition of farm properties previously anticipated."

187. These above statements were materially false and misleading and omitted material facts because, as the Chancery Court found, far from the July Projections being "based on the best then-currently available information," Defendant Carter knowingly provided a false set of

projections that intentionally tried to mislead the Special Committee for Murdock's benefit. The Chancery Court further found that:

(i) Dole management could not provide a basis for the reduction in revenue forecasts as compared to the December Projections;

(ii) The July Projections were inconsistent with what Dole gave its lenders in April 2013 for the post-ITOCHU Transaction refinancing;

(iii) The forecasts were inconsistent with what the Board reviewed just weeks earlier when approving the purchase of the new ships;

(iv) The growth forecasted for 2014 and 2015 was "just an extrapolation based on a mathematical formula, not on real information"; and

(v) Dole management inexplicably kept flat the EBITDA estimates for 2016 and 2017 except for a small adjustment for new cargo ships.

(Memorandum Opinion, 2015 WL 5052214, at *31.)

188. Indeed, as the Chancery Court stated, Conrad concluded that the July Projections were not "an accurate representation of the value of the Company," and Garner believed that "management had taken a meat cleaver to the projections in a way that it would be very difficult, if not inappropriate, for a committee to weigh these projections as the basis for determining the adequacy of a price." (*Id.* at *18, 31.) The Chancery Court concluded that Carter engaged in "fraud" and that "the false projections were the most egregious of Carter's activities." (*Id.* at *32.)

189. To that end, the August 2013 Preliminary Proxy Statement also stated:

> [On] July 12, 2013, members of Dole's management held a meeting with representatives of Deutsche Bank to review the five-year EBITDA projections presented at the Board meeting the day before. Later that day, representatives of Lazard and Sullivan & Cromwell . . . participated in a conference call with members of Dole's management in which they reviewed with them the five year EBITDA projections.

190. These above statements were materially false and misleading and omitted material facts because, as the Chancery Court found, at the July 12, 2013 Lender Meeting, Carter

informed Murdock's bankers that Dole would outperform the July Projections. Specifically, Carter stated that Dole would "beat or meet forecasts of $155 [million in EBITDA]," and that Dole could "upsize the projection by $18-$19 [million]." Moreover, at that meeting, Carter discussed the projected $50 million in post-ITOCHU Transaction cost savings, explicitly stating that Dole had already achieved $20 million of cost savings in EBITDA for 2013. Carter also told Murdock's bankers during this meeting that Dole would be able to substantially increase its income by buying more farms, and that notes taken by a Deutsche Bank representative reflected that Dole's farm purchases "easily could be $100 [million] ($15 [million] initial return or 20% EBITDA margin)." (Memorandum Opinion, 2015 WL 5052214, at *20.)

191. Additionally, the statement concerning the conference call with "representatives of Lazard and Sullivan & Cromwell" is materially false and misleading because it fails to disclose that Carter concealed Dole's true financial and operational projections and instead presented the falsified July Projections to Lazard and Sullivan & Cromwell. Finally, the above statement failed to disclose that this meeting violated the procedures that the Special Committee had established, including the fact that Murdock and his advisors were required to go through the Special Committee when interacting with Dole on matters relating to Murdock's proposal.

#### 4. Misstatements And Omissions Concerning Murdock's Reasons For The Transaction

192. The August 21, 2013 Preliminary Proxy Statement also falsely stated Defendant Murdock's purported reasons to pursue taking Dole private. Specifically, the August 21, 2013 Preliminary Proxy Statement stated the following reasons why Murdock was seeking to acquire all outstanding shares of Dole common stock:

> Beginning in May 2013, Mr. Murdock reviewed and considered the stock markets' reaction to the ITOCHU sale transaction and the related reduction in debt. Mr. Murdock also considered the historical impact on Dole's stock price of earnings variability, restructuring and cost reduction efforts, and the risks

> associated with the commodity nature of Dole's remaining businesses. After doing so, ***he came to the view that it was unlikely that the stock markets would fully respond to debt reductions and potential improvement in Dole's operations with a sustained higher stock price***. . . . In Mr. Murdock's view, factors beyond Dole's control, including the fact that Dole deals in perishable commodities, which are subject to external factors that result in unpredictable quarterly earnings, were unlikely to change in the foreseeable future and would continue to adversely affect Dole's operating results. ***He also came to the view that the stock markets' reaction to such factors has tempered or overridden the effect of debt and other cost reduction efforts, and was likely to continue to adversely affect Dole's stock price***.

193. Indeed, the August 21, 2013 Preliminary Proxy Statement further stated that based upon these alleged reasons, "[i]n May 2013, Murdock retained Deutsche Bank as financial advisor . . . to assist him in considering alternatives, which included pursuing a going private transaction with Dole."

194. These above statements regarding Murdock's purported reasons for pursuing the Take-Private Transaction were materially false and misleading and omitted material facts because, as the Chancery Court found, Murdock sought to undertake the Take-Private Transaction in 2012 consistent with the Tesoriero Memo and the advice of and frequent consultation with Deutsche Bank. These statements were also materially false and misleading and omitted material facts because Defendants knew that after the ITOCHU Transaction, the Company could achieve significant cost savings above $50 million while substantially increasing its income through Dole's planned acquisition of farms, which would likely have a positive – not adverse – effect on Dole's stock price.

195. As noted above, following the August 21, 2013 Preliminary Proxy Statement, Dole filed the following Proxy Statements with the SEC in connection with the Take-Private Transaction: (i) a September 20, 2013 Preliminary Proxy Statement; (ii) an October 1, 2013 Preliminary Proxy Statement; and (iii) the October 3, 2013 Definitive Proxy Statement. Defendant Carter signed each of the Proxy Statements. These Proxy Statements contained

identical or substantially identical materially false and misleading statements and omissions of material fact as the August 21, 2013 Preliminary Proxy Statement. Accordingly, these subsequently filed Proxy Statements were materially false and misleading and omitted material facts for the reasons set forth above in Paragraphs 180, 182, 184, 187, 190, 191, and 194.

## VII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

196. As alleged in this Complaint, Defendants engaged in a scheme to defraud investors by artificially deflating Dole's stock price through numerous materially false and misleading statements, and omissions of material fact, so that Defendant Murdock could freeze out Dole's public shareholders at a significantly lower price than if Defendants had publicly disseminated accurate and truthful information. Defendants, when they committed that misconduct, acted with scienter in that they knew, or recklessly disregarded, that the public statements issued or disseminated and detailed in Section VI above were materially false or misleading, and knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws. The allegations detailing Defendants' fraudulent scheme, detailed in Section IV above, are incorporated in this Section by reference and provide powerful evidence of Defendants' scienter. Other facts evidencing Defendants' scienter are alleged below.

197. First, after nine days of trial, including voluminous documentary evidence, and live testimony by several witnesses including Defendant Murdock and Defendant Carter, the Chancery Court found that Murdock and Carter willfully disseminated materially false and misleading information, and omitted material facts, to investors in order to artificially deflate the market price of Dole stock. As the court found, "[Murdock's and Carter's] actions were not innocent or inadvertent, but rather intentional and in bad faith," and "Carter engaged in fraud." (Memorandum Opinion, 2015 WL 5052214, at *2.)

198. Further, the Court found that "[f]or Carter to have intentionally given the market a subterranean estimate of Dole's anticipated cost savings matches up with his unilateral and pretextual cancellation of the stock repurchase program that the Board adopted on May 8, 2013," that "[t]he [July P]rojections Carter provided were knowingly false," and that "Carter intentionally tried to mislead the Committee for Murdock's benefit." (*Id.* at *2, 28, 31.) Indeed, with regard to cancelling the Stock Repurchase Program, Carter testified that he knew doing so would drive down Dole's stock price, and admitted that the Company could have paid in full for its new ships and repurchased $200 million worth of shares without breaching Dole's debt covenants – the pretextual reason that Carter gave at the time that he cancelled the Stock Repurchase Program.

199. <u>Second</u>, Defendants' misstatements and omissions occurred as part of a pre-planned course of action designed to enable Murdock to take Dole private as cheaply as possible. The January 2012 Tesoriero Memo began to chart Murdock's strategy, beginning with Dole's divestiture of assets (in the form of the ITOCHU Transaction) and going through to his taking control of the remainder of the Company. Numerous material false statements alleged above occurred alongside key steps of Murdock's take-private plan. As the Chancery Court found, "Carter made the [January 2, 2013] announcement" that cost savings from the ITOCHU transaction would be $20 million rather than $50 million "just as internal discussions about the freeze-out were heating up," and nine days before Deutsche Bank sent Dole management a presentation modeling options for a Murdock freeze-out that assumed a purchase price of $12.00 per share. (*Id.* at *11.) Then, on January 24, 2013, Carter falsely stated that Dole expected 2013 adjusted EBITDA to be at the "low end" of the Company's guidance range, only one day before

Deutsche Bank sent another presentation discussing different approaches to effectuate Murdock's take-private strategy. (*Id.*)

200. Further, Defendants canceled the Stock Repurchase Program on May 28, 2013, less than three weeks after it began, precisely because Murdock and Carter knew it would drive Dole's share price down just before Murdock made his $12.00-per-share offer for the Company. As reflected in Deutsche Bank emails on May 23, 2013 – five days prior to the cancellation of the Stock Repurchase Program – Murdock told Deutsche Bank he would "stand down for a few weeks to watch the share price," and Carter himself acknowledged that he "expect[ed] a negative reaction" after cancelling the Stock Repurchase Program.

201. Third, several documents, including presentations and communications that Murdock and Carter received, reviewed, created, and/or disseminated, demonstrated that they knew the falsity of their representations concerning the magnitude of cost savings flowing from the ITOCHU Transaction and Dole's planned farm purchases. Multiple analyses showed Dole achieving at least $50 million in cost savings, including a September 5, 2012 presentation by Deutsche Bank, a December 2012 presentation by Deutsche Bank, and the January 29, 2013 internal Company projections showing $62 million in cost savings. Similarly, internal documents evidence Dole's present and future purchases of farms, which the Company recognized would improve margins on fresh fruit and generate several million dollars per year in incremental income. When Carter met with Murdock's lenders and advisors on July 12, 2013 at the Lender Meeting, he provided accurate information, projecting $50 million in cost savings from the ITOCHU Transaction and $100 million of farm purchases that would produce a $15 million initial return, or 20% EBITDA margin.

202. Fourth, Defendant Carter's manipulation of the process surrounding the Take-Private Transaction, including his interference with the Special Committee and his misrepresentations to the Board and the Special Committee, support a strong inference of scienter. As discussed above at Paragraphs 88-103, Carter intentionally and improperly: (i) provided the artificially weak July Projections to the Board and the Special Committee, which centered on EBITDA forecasts that Carter manufactured without any input from Dole's division heads, which would have been the usual practice; (ii) attempted to limit the scope of the Special Committee's work; (iii) insisted on controlling any potential bidders' access to nonpublic Company information; and (iv) tried to prevent the Special Committee from retaining its own chosen advisors. As the Chancery Court concluded, "Murdock and Carter's conduct throughout the Committee process . . . demonstrated that their actions were not innocent or inadvertent, but rather intentional and in bad faith."

203. Fifth, Murdock had long shown disdain for his public investors, repeatedly lamenting their presence and placing his interests before theirs. Murdock himself said that he "never really wanted" to take the company public, and only did so out of "necessity," but that he was still "the boss" who "does what he wants to do." The Chancery Court also found that Murdock and Carter cancelled the Stock Repurchase Program "to spite the outside directors and teach them a lesson about who was really in charge." (*Id.* at *28 n.15.) And Murdock timed the announcement of his offer to take the Company private expressly to take advantage of a downturn in Dole's stock price.

204. Indeed, Murdock never acted out of concern for shareholder value. Murdock's June 10, 2013 letter announcing his bid to take the Company private falsely stated that management had valiantly but unsuccessfully tried to increase shareholder value through the

ITOCHU Transaction and otherwise, while he knew that the costs savings from the ITOCHU Transaction, the Stock Repurchase Program and farm purchases would actually drive Dole's share price and profitability up significantly.

205. Sixth, Dole acted with scienter because the scienter of top executives Murdock and Carter is imputed to the Company that the Individual Defendants spoke on behalf of and controlled. Murdock was Dole's Chairman and CEO, and beneficial owner of approximately 40% of Dole's stock during the Class Period, and Carter was Dole's President, COO, General Counsel, and Corporate Secretary, and a member of the Board. Defendants Murdock and Carter each made and caused to be made materially false statements and omissions that misled investors, as detailed in this Complaint.

## VIII. LOSS CAUSATION

206. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive investors. Defendants' materially false and misleading statements as set forth above artificially depressed the price of Dole's common stock below the price at which Dole common stock would have traded absent those material misrepresentations and omissions. For example, on January 2, 2013, Defendant Carter issued false guidance projecting 2013 Adjusted EBITDA in the $150-$170 million range, based on Dole achieving only $20 million in cost savings as a result of the ITOCHU Transaction. On that news, the market price of Dole common shares fell $1.90 per share, or 13.4%, to close at $9.93 on January 2, 2013. Also as an example, on March 12, 2013, just before the close of trading, Carter issued further false guidance, projecting 2013 Adjusted EBITDA at the "lower end" of the previously announced $150-170 million range. On that news, the market price of Dole common shares fell $1.09 per share, or 9.0%, to close at $10.67 on March 13, 2013.

207. Because of Defendants' fraudulent scheme discussed above at Section IV, the Special Committee agreed to Defendant Murdock's offer of $13.50 per share for all the common shares of Dole he did not already own. However, had the market known the full truth about Dole's financial and business prospects, Dole's stock price would have been trading at higher prices during the Class Period reflecting the Company's true financial performance and expected growth. As Vice Chancellor Laster found after the Chancery Court Trial, at the time that Murdock took Dole private, the fair value of Dole common shares was as high as $20.92 per share.

208. Defendants' materially false and misleading statements and omissions of material fact operated as a fraud or deceit on the Class, and induced the Class to sell Dole shares at prices that were below the actual value of those securities, and thereby caused damage to the Class. As a result of their sales of Dole's common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## IX. CLASS ACTION ALLEGATIONS

209. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all sellers of Dole common stock during the Class Period. Excluded from the Class are Defendants and their families and affiliates, and directors and officers of Dole, and their families and affiliates.

210. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of September 27, 2013, Dole had 54,615,380 shares of common stock outstanding and held by non-insiders.

211. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class members include:

(i) Whether Defendants violated the Exchange Act;

(ii) Whether Defendants omitted and/or misrepresented material facts;

(iii) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(iv) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(v) Whether the price of Dole common stock was artificially deflated;

(vi) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(vii) The extent of damage sustained by Class members and the appropriate measure of damages.

212. Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

213. Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

214. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

215. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or

misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Dole and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.

216. For example, among other things, when Defendant Carter told investors on January 2, 2013 that Dole would achieve $20 million in cost savings and Adjusted EBITDA in the $150-$170 million range in 2013, and on March 12, 2013 projected Adjusted EBITDA at the "lower end" of the $150-$170 million range based on "expected sustainable cost savings of $20 million," he knew that analyses by Dole and its advisors showed at least $50 million in cost savings, thereby supporting Adjusted EBITDA substantially higher than $150-$170 million.

## XI. PRESUMPTION OF RELIANCE

217. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

218. In the alternative, Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Dole securities was open, efficient, and well developed for the following reasons, among others:

(i) Dole stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(ii) As a regulated issuer, Dole filed periodic public reports with the SEC and the NYSE;

(iii) Dole regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(iv) Dole was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the salesforces and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the marketplace.

219. As a result of the foregoing, the market for Dole securities promptly digested information regarding Dole from all publicly available sources and reflected such information in the price of Dole stock. Under these circumstances, all sellers of Dole common stock during the Class Period suffered similar injury through their sale of Dole common stock at artificially deflated prices, and the presumption of reliance applies.

220. Accordingly, Lead Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Dole securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## COUNT I:

### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 (Against Dole, Murdock and Carter)

221. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

222. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to sell Dole securities at artificially deflated prices.

223. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for Dole securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

224. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

225. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendant Murdock made the materially false and misleading statements in his June 10, 2013 letter to the Dole Board and shareholders discussed above at Paragraphs 162 and 163. Defendant Carter made the materially false and misleading statements set forth in the January 2, 2013 Press Release discussed above at Paragraphs 131 to 134; made the materially false and misleading statements in the January 24, 2013 Press Release and the January 25, 2013 Form 8-K, which Carter also signed, discussed above at Paragraphs 135 to 142; signed the February 25, 2013 Form 8-K discussed above at Paragraphs 143 to 148; signed the 2012 Form10-K and made the

materially false and misleading statements during the attendant conference call discussed above at Paragraphs 149 to 154; made the materially false and misleading statements in connection with Dole's May 2, 2013 announcement of first-quarter 2013 earnings results discussed above at Paragraphs 155 to 159; signed the May 28, 2013 Form 8-K containing materially false and misleading statements discussed above at Paragraphs 160 to 161; made the materially false and misleading statements on the July 25, 2013 Earnings Conference Call discussed above at Paragraphs 164 to 176; and signed the Proxy Statements containing materially false and misleading statements discussed above at Paragraphs 177 to 195.

226. In addition, each of the Proxy Statements misrepresented and failed to disclose material information required to be disclosed in connection with going-private transactions under SEC Rule 13e-3, 17 C.F.R. § 240.13e-3. Among other things, Rule 13e-3, which is titled "Going private transactions by certain issuers or their affiliates," provides that "[i]t shall be a fraudulent, deceptive or manipulative act or practice" for issuers "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.13e-3(b)(1)(ii). As the SEC has explained, Rule 13e-3 is designed to protect shareholders in a going-private transaction by ensuring that "the terms of the transaction, including the consideration received . . . [are not] designed to accommodate the interests of the affiliated parties rather than determined as a result of arms-length negotiations." SEC release 34-17719 (1981). Here, the Proxy Statements contained false misrepresentations and omissions of material facts, in violation of Rule 13e-3, for the reasons set forth above in Paragraphs 180, 182, 184, 187, 190, 191, 194, and 195. Thus, Defendants are liable under Section 10(b) and Rule 10b-5 for violations of Rule 13e-3.

227. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to falsely misrepresent Dole's true condition to the investing public and to support the artificially low prices of the Company's securities.

228. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

229. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II:

### For Violations Of Section 20(a) Of The Exchange Act (Against The Individual Defendants)

230. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

231. During the Class Period, Defendants Murdock and Carter acted as controlling persons of Dole within the meaning of Section 20(a) of the Exchange Act.

232. By reason of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of direct control of, and/or supervisory involvement in Dole's day-to-day operations during the Class Period, Defendants Murdock and Carter had the power to, and did, control and influence the decision making of the Company and the conduct of Dole's business, including the wrongful conduct complained of herein. Defendants Murdock and Carter were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Lead Plaintiffs allege to be materially false and misleading. Moreover, Defendants Murdock and Carter had a duty to disseminate

accurate and truthful information regarding Dole's operations to correct any previously issued statements that had become untrue so that the market price of Dole securities would be based upon truthful and accurate information.

233. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Murdock and Carter had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations alleged herein. Defendants Murdock and Carter were also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Dole during the Class Period. Further, as detailed above, Defendants Murdock and Carter had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC. As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Dole within the meaning of Section 20(a) of the Exchange Act.

234. As a direct and proximate cause of Defendants Murdock's and Carter's wrongful conduct as set forth in this Count, Lead Plaintiffs and other members of the Class suffered damages in connection with their sales of Dole securities during the Class Period.

235. By virtue of their positions as controlling persons of Dole and as a result of their own aforementioned conduct, Defendants Murdock and Carter, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

**PRAYER FOR RELIEF**

236. WHEREFORE, Lead Plaintiffs pray for judgment as follows: (i) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; (ii) awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all

Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; (iii) awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; (iv) awarding rescissory damages; and (v) awarding such equitable/injunctive or further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

237. Lead Plaintiffs demand a trial by jury.

FRIEDLANDER & GORRIS, P.A.

*/s/ Joel Friedlander*
Joel Friedlander (Bar No. 3163)
Jeffrey M. Gorris (Bar No. 5012)
Christopher Foulds (Bar No. 5169)
1201 N. Market Street, Suite 2200
Wilmington, Delaware 19801
(302) 573-3500
jfriedlander@friedlandergorris.com
jgorris@friedlandergorris.com
cfoulds@friedlandergorris.com

*Liaison Counsel for Lead Plaintiffs*

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
John C. Browne
Katherine Sinderson
Jai Chandrasekhar
Adam D. Hollander
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400
johnb@blbglaw.com
katiem@blbglaw.com
jai@blbglaw.com
adam.hollander@blbglaw.com

ENTWISTLE & CAPPUCCI LLP

Vincent R. Cappucci
Arthur V. Nealon
Jordan A. Cortez
299 Park Avenue
20th Floor
New York, New York 10171
(212) 894-7200
vcappucci@entwistle-law.com
anealon@entwistle-law.com
jcortez@entwistle-law.com

DATED: June 23, 2016

*Lead Counsel for Lead Plaintiffs*